IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

| | | |
|---|---|---|
| LIGHTHOUSE FRANCHISE SYSTEMS, LLC | § § § | |
| Plaintiff, | § § | CASE NO. __2:17-cv-00143__ |
| VS. | § § | |
| | § | |
| ALEX B. JONES and KATTIE JONES | § § | |
| Defendants. | § § | |

## COMPLAINT

The plaintiff Lighthouse Franchise Systems, LLC ("Lighthouse"), through the undersigned counsel, for its Complaint alleges as follows:

### PRELIMINARY STATEMENT

This is an action for breach of contract arising out of the defendants' failure to comply with the terms of their franchise agreement with Lighthouse before and after the termination of that agreement, including their covenant not to compete with Lighthouse, and for service mark infringement and unfair competition arising out of the defendants' unauthorized use of Lighthouse's marks after the expiration of their franchise agreement.  Lighthouse seeks its damages (including its attorneys' fees incurred in obtaining the defendants' compliance with their contractual obligations) and preliminary and permanent injunctive relief.

### THE PARTIES

1.      Lighthouse is a Pennsylvania limited liability company with its principal place of business in West Chester, Pennsylvania.

142687v1

2.      The sole member of Lighthouse is Corelight Holdings LLC ("Corelight").

Corelight's sole member is TQS Holdings LLC ("TQS").  TQS's sole member is Ronny Tang.

Corelight and TQS are both Pennsylvania limited liability companies. Corelight's principal place

of business is in West Chester, Pennsylvania.  TQS's principal places of business is in Exton,

Pennsylvania.  Tang is a citizen of the Commonwealth of Pennsylvania and resides in Exton,

Pennsylvania.

3.      Defendant Alex B. Jones is a citizen of the state of Texas and resides at 3925

Kileen Drive, Amarillo, Texas  79109.

4.      Defendant Kattie Jones is a citizen of the state of Texas and resides at 3925

Kileen Drive, Amarillo, Texas  79109.

## JURISDICTION AND VENUE

5.      This is a civil action arising under the Lanham Act, 15 U.S.C. § 1051 et seq., and

the contracts between the parties.

6.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C.

§§ 1331, 1332, 1367 and 15 U.S.C. §§ 1121 and 1116.

7.      Venue in this Court is proper pursuant to 28 U.S.C. § 1391(b)(1) and (2) because

both defendants reside in this District and because a substantial part of the events or omissions

giving rise to Lighthouse's claims occurred in this District.

## THE LIGHTHOUSE LANDSCAPE LIGHTING SYSTEM

8.      Lighthouse's predecessor in interest, Lighthouse Landscape Lighting Franchisor,

Inc. ("LLLF"), was the franchisor of the LIGHTHOUSE LANDSCAPE LIGHTING franchise

system prior to 2015. LLLF was the original owner of the federally-registered service marks

LIGHTHOUSE LANDSCAPE LIGHTING (U.S. Reg. No. 4,435,761) and LIGHTHOUSE

OUTDOOR LIVING (U.S. Reg. No. 4,435,779) (the "LIGHTHOUSE Marks").  Beginning in

December 2002, LLLF licensed others to use the LIGHTHOUSE Marks in connection with the operation of a business that provides for the sale, installation, and service of landscape lighting products.

9.      In June 2015, Lighthouse acquired the assets of LLLF, including all right, title and interest in the LIGHTHOUSE Marks and all franchise agreements licensing others to use those Marks.

10.      Lighthouse has the exclusive right to operate and license others to operate landscape lighting businesses using the LIGHTHOUSE Marks.  Franchised LIGHTHOUSE LANDSCAPE LIGHTING businesses are operated in accordance with Lighthouse's business and operating procedures for selling, installing, and servicing landscape lighting products to the public ("LIGHTHOUSE Services").  The LIGHTHOUSE Marks have come to identify, in the public mind, these distinctive LIGHTHOUSE Services made available by licensed LIGHTHOUSE franchisees.

11.      In addition to using the LIGHTHOUSE Marks, franchised LIGHTHOUSE LANDSCAPE LIGHTING businesses are operated in association with Lighthouse's detailed standards, specifications, procedures, and methods for providing LIGHTHOUSE Services (the "LIGHTHOUSE System").

12.      The standards, specifications and methods of the LIGHTHOUSE System are set forth in Lighthouse's confidential and proprietary operations manual, copies of which are provided to all LIGHTHOUSE LANDSCAPE LIGHTING franchisees (the "Manual").  The Manual includes detailed standards, specifications, instructions, requirements, methods and procedures for management and operation of a franchised LIGHTHOUSE LANDSCAPE LIGHTING business, including information regarding sources of supply; landscape lighting

3                                                                              142687v1

designs; lighting and landscaping elements; equipment and tools; installation of lighting, fixtures, and wiring; maintenance and service of lighting systems; sales and marketing; scheduling and project management; and other elements relating to the operation of a landscape lighting business.

## THE FRANCHISE AGREEMENT BETWEEN THE PARTIES

13.     LLLF and Defendant Alex B. Jones ("Jones") entered into a franchise agreement, which was dated as of May 2, 2012 (the "Franchise Agreement").  Pursuant the Franchise Agreement, Jones was licensed to use the LIGHTHOUSE Marks and LIGHTHOUSE System to provide LIGHTHOUSE Services in connection with the operation of a landscape lighting business (the "Franchised Business") servicing areas in West Texas, including the cities of Amarillo, Lubbock, and Midland, Texas (the "Protected Territory").  A true and correct copy of the Franchise Agreement is attached as Exhibit 1.

14.     Concurrent with Jones' execution of the Franchise Agreement, Jones and his wife Defendant Kattie Jones ("Guarantors") each executed a Guarantee, Indemnification, and Acknowledgement Agreement ("Guarantee") personally guaranteeing of all of Jones' obligations under the Franchise Agreement, including the obligation to punctually pay all money owed to LLLF.  Pursuant to the Guarantee, Guarantors also agreed that they would each be personally liable for Jones' breach of the Franchise Agreement and that they would be bound by the covenants in Sections 8.1.2, 10, 13, 15, and 16 of the Franchise Agreement, which covenants would survive expiration of the Franchise Agreement.  A true and correct copy of the Guarantee is attached as Exhibit 2.

15.     In connection with Lighthouse's purchase of LLLF's assets in June 2015, the Franchise Agreement and Guarantee were assigned to Lighthouse, and Lighthouse assumed the rights and obligations of LLLF as the franchisor under those Agreements.

4

16.     Section 3 of the Franchise Agreement provides that the term of the Franchise Agreement is five years from the date of the Franchise Agreement, or through May 2, 2017. Under Section 3, Jones had the right to renew the Franchise Agreement for at least one additional five-year term, subject to meeting certain conditions.

17.     Section 4 of the Franchise Agreement obligated Jones' to pay Lighthouse a monthly royalty fee of 7% of Total Gross Revenue for the operation of the Franchised Business. The Franchise Agreement defined Total Gross Revenue as "all revenue from the sale of all merchandise, products, and/or services, and all other income of every kind and nature related to, derived from, or originating from the [Franchised Business] . . . ."

18.     Pursuant to Section 7.1 of the Franchise Agreement, Jones agreed that all data provided by Jones, uploaded to Lighthouse's computer system, downloaded from Jones' computer system to Lighthouse's computer system, and/or created or collected by Jones in connection with the LIGHTHOUSE System or in operating the Franchised Business (including customer and transaction data) would be owned by Lighthouse during the term of the Franchise Agreement and following expiration of the Franchise Agreement.

19.     Under Section 15 of the Franchise Agreement, Jones agreed to take certain actions upon termination or expiration of the Franchise Agreement, including the following:

A.     Immediately cease operating the Franchised Business and not hold himself out to the public as a LIGHTHOUSE LANDSCAPE LIGHTING franchisee (Section 15.1);

B.     Immediately and permanently stop using, in any manner, the LIGHTHOUSE Marks and all confidential and proprietary methods, procedures, and techniques associated with the LIGHTHOUSE system, which would include all pictures of landscaping projects that were completed while Jones was a LIGHTHOUSE LANDSCAPE LIGHTING franchisee (Sections 15.2 and 15.4);

C.     Pay to Lighthouse all amounts owed to Lighthouse, including damages and costs that Lighthouse incurred in obtaining Jones' compliance with his post-expiration obligations (Sections 15.5 and 15.6.);

5                                                                    142687v1

D.    Return to Lighthouse all materials, including the Manuals and other instruction materials, records, and customer lists, relating to the Franchised Business (Section 15.7); and

E.    Transfer to Lighthouse all telephone numbers, email addresses, domain names, social media accounts, and other online accounts (including Angie's List and Houzz accounts) that Jones used or created in connection with operating the Franchised Business (Section 15.9).

20.    In Sections 16.2 and 16.3, Jones further agreed and covenanted that, during the terms of the Franchise Agreement, he would devote his full time, energy, and best efforts to the operation of the Franchised Business and that he would not divert any business or customers to any competitor or independently offer or sell merchandise, products, or services that were same or similar to the merchandise, products, or services offered or sold through the Franchised Business.

21.    Jones also agreed in Section 16.4 that, for an uninterrupted and continuous period of two years after termination or expiration of the Franchise Agreement, he would not directly or indirectly, own or operate any business providing outdoor lighting services or products within ten miles of the Protected Territory of the Franchised Business.

22.    In Section 16.8, Jones acknowledged that his breach of the covenants contained in Section 16 of the Franchise Agreement would result in irreparable injury to Lighthouse and consented to the issuance of an injunction to prohibit any conduct in violation of those covenants.

## EXPIRATION OF THE FRANCHISE AGREEMENT AND JONES' PREPARATION TO OPERATE A COMPETING BUSINESS

23.    Beginning in early 2017, Lighthouse began oral discussions with Jones about whether he intended to exercise his right to renew the Franchise Agreement for an additional five-year term.  Jones failed to provide Lighthouse with any clear answer as to his intentions, but, at the same time, continued to solicit landscape lighting projects for his Franchised Business.

6

24.     By its terms, the Franchise Agreement expired on May 2, 2017.  Notwithstanding this fact, and the fact that Jones had never advised Lighthouse whether he intended to exercise his right to renew the Franchise Agreement, Jones continued to hold out the Franchised Business as a LIGHTHOUSE LANDSCAPE LIGHTING franchised business, sending proposals and invoices on forms bearing the LIGHTHOUSE Marks, communicating with customers and prospective customers using the lighthouse-lights.com email address that Lighthouse hosted and had designated for him to use, and representing himself to be associated with Lighthouse in his signature block in his email, which included an office telephone number and mobile telephone number associated with the LIGHTHOUSE Marks and the Franchised Business.

25.     Jones created a separate email account – abjoneslighting@gmail.com – and, in early May 2017, he began forwarding to that email address customer communications (including communications relating to job proposals and invoices) that he sent and received at the lighthouse-lights.com email Lighthouse had designated for his use.

26.     Late in the afternoon on Friday, May 19, 2017, in response to another request from Lighthouse about his intentions, Jones finally notified Lighthouse that he did not intend to exercise his right to renew the Franchise Agreement.  Lighthouse advised Jones that it would give him the weekend to rethink this decision, but expected to hear from him by the close of business on Monday, May 22, 2017.

27.     On May 22, 2017, Jones registered the domain name "jonesoutdoorlighting.com" using his designated lighthouse-lights.com email address.

28.     On or about May 25, 2017, Jones sent an email from his designated lighthouse-lights.com email address to Houzz (www.houzz.com), a website that provides consumers with home design and improvement resources, including hosting website pages for home

142687v1

improvement contractors to market their services to consumers by email.  In his email to Houzz, Jones requested that Houzz change the page name for the Houzz hosted website page for the Franchised Business from LIGHTHOUSE LANDSCAPE LIGHTING to Jones Outdoor Lighting; on information and belief, Jones neither requested that Houzz cancel the Houzz website page for his Franchised Business nor created a new Houzz account and website page for his new business.

29.     In late May 2017, Jones modified the account for the Facebook page that he had created to market his Franchised Business to market his business as Jones Outdoor Lighting.  On information and belief, Jones did not create a new Facebook account for his new business.

30.     After learning that Mr. Jones was continuing to operate his landscape lighting business after the expiration of the Franchise Agreement and notification to Lighthouse that he did not intend to renew that Agreement, on July 17, 2017, Lighthouse sent Jones a letter demanding that he cease and desist from breaching his post-expiration contractual obligations, transfer the telephone numbers and online accounts to Lighthouse, and provide accounting records so that Lighthouse could determine the total amount owed in unpaid royalty fees. Lighthouse demanded that Jones respond within ten days.  A copy of that letter is attached as Exhibit 3.  Jones never responded to Lighthouse's letter or its demands.

**JONES' CONTINUING OPERATION OF A LANDSCAPE LIGHTING BUSINESS AND SOLICITATION OF LIGHTHOUSE CUSTOMERS**

31.     Notwithstanding the expiration of the Franchise Agreement, Jones continued to use the LIGHTHOUSE Marks and System to solicit customers and operate his landscape lighting business throughout May 2017.  During that same time, Jones was making plans to convert the Franchised Business to an independent landscape lighting business under the name "Jones

Outdoor Lighting" and was taking active steps to divert customers of his Franchised Business to his new, competing business.

32.     In disregard of his post-termination contractual obligations and Lighthouse's demand that Jones comply with those obligations, Jones has continued to operate a landscape lighting business and is diverting customers – including customers to whom he provided services while he operated the Franchised Business – to his new, competing business.  In operating that business, Jones has continued to use the telephone numbers, business address, Facebook account, and Houzz accounts, among other accounts, that he created and/or used to market his Franchised Business, and that were therefore associated with the LIGHTHOUSE Marks and System, to market and operate his competing business.

33.     Jones' website (jonesoutdoorlighting.com), Facebook page, and Houzz account each show pictures of jobs and quote testimonials of customers that relate to work that was completed while he operated the Franchised Business as a LIGHTHOUSE LANDSCAPE LIGHTING franchisee.  Many of the customer reviews listed mention his business as "Lighthouse."  By using those pictures and reviews/testimonials, Jones is trading off of the goodwill generated over the past five years using the LIGHTHOUSE Marks and LIGHTHOUSE System to operate the Franchised Business.

34.     As the result of (a) Jones' failure to advise Lighthouse of his intention not to renew, even though he knew well in advance of the expiration date that he had no intention of renewing the Franchise Agreement, (b) his continued operation of a landscape lighting business in the Protected Territory, (c) his solicitation of former and potential customers of Lighthouse and the LIGHTHOUSE System, and (d) his continued use of telephone numbers and web accounts that are and were associated in those customers' minds with the LIGHTHOUSE Marks

9                                                                                    142687v1

and System, Lighthouse has been and will continue to be unable to market Jones' former Protected Territory to a new franchisee to recover and retain the customer goodwill associated with the LIGHTHOUSE Marks and System in Jones' former Protected Territory.

35.     Other LIGHTHOUSE LANDSCAPE LIGHTING franchisees whose agreements are due to expire soon have advised Lighthouse that they are considering not renewing their franchise agreements and instead planning to begin operating independent, competing businesses.  Those franchisees have specifically referred to the actions taken by Jones in electing not to renew his Franchise Agreement and continuing to operate as an independent landscape lighting business, in violation of his covenant not to compete.

36.     Jones' actions are therefore causing irreparable harm to Lighthouse.

**COUNT ONE**

**(Breach of Contract - Post-Termination Obligations)**

37.     Lighthouse realleges Paragraphs 1-35 of this Complaint.

38.     Despite the expiration of the Franchise Agreement, Jones failed to comply with his post-expiration contractual obligations under the Franchise Agreement.  Jones continued to use the LIGHTHOUSE Marks and System to solicit customers and potential customers, all while planning to divert those customers and business to his competing landscape lighting business, in breach of Sections 15 and 16 of the Franchise Agreement.

39.     Jones has further breached Section 15 of the Franchise Agreement by failing to surrender to Lighthouse the Manual and other materials relating to the formerly-Franchised Business.

40.     Jones has further breached Section 15 of the Franchise Agreement by failing to transfer to Lighthouse the telephone numbers and online accounts that he used in the operation of his Franchised Business and which are associated with the LIGHTHOUSE Marks and System.

41.     Jones has further breached Section 15 of the Franchise Agreement by utilizing pictures and customer reviews and testimonials that relate to our reflect work completed while the Franchised Business was operating as a LIGHTHOUSE LANDSCAPE LIGHTING franchised business.

42.     Jones has also breached Section 16 of the Franchise Agreement by continuing after expiration of the Franchise Agreement to operate business which offers and sells outdoor lighting services and products within ten miles of the area that had been the Protected Area under the Franchise Agreement.

43.     As guarantor of Jones' obligations under the Franchise Agreement, Guarantors are jointly and severally liable for Jones' breaches of the post-expiration obligations under the Franchise Agreement.  In addition, Guarantors are jointly and severally liable for Jones' breach of Section 16 of the Franchise Agreement, and directly liable for breach of the Guarantee for aiding Jones in operating a business in violation of the post-expiration covenant against competition.

44.     The conduct set forth herein has caused and continues to cause irreparable injury and damage to Lighthouse's reputation and goodwill and to the LIGHTHOUSE LANDSCAPE LIGHTING franchise system, which injury will continue unabated unless enjoined by this Court.

45.     In addition, Lighthouse has sustained actual damages, costs, and attorneys' fees as a result of the defendants' breach of their contractual post-expiration obligations in an amount to be proved at trial.

## COUNT TWO

### (Breach of Contract – Failure to Pay Amounts Owed)

46.      Lighthouse realleges Paragraphs 1-44 of this Complaint.

47.      Jones' failed to report its Total Gross Revenues on all projects completed by the Franchised Business prior to expiration of the Franchise Agreement.

48.      As a result, Jones failed to pay royalty fees due on its Total Gross Revenues as required under Section 4.2 of the Franchise Agreement, as well as interest and late fees due on those past-due amounts.  Jones failure to pay these amounts due to Lighthouse is a breach of the Franchise Agreement.

49.      Lighthouse has been damaged by Jones' breach of the Franchise Agreement through its failure to pay amounts due through the expiration of the Franchise Agreement on May 2, 2017, in an amount to be proved at trial, plus interest and late fees.

50.      As guarantors of Jones' obligations under the Franchise Agreement, Guarantors are jointly and severally liable for Jones' breach.

## COUNT THREE

### (Service Mark Infringement)

51.      Lighthouse realleges Paragraphs 1- 49 of this Complaint.

52.      Jones' continued use of the LIGHTHOUSE Marks without authorization or license after expiration of the Franchise Agreement caused confusion in the public mind concerning the source, affiliation, or sponsorship of goods and services being offered by Jones under the LIGHTHOUSE Marks.

53.      Consumers believed, contrary to fact, that Jones continued to be an authorized LIGHTHOUSE LANDSCAPE LIGHTING franchisee and that his landscape lighting business was a legitimate member of the LIGHTHOUSE franchise system.

142687v1

54.     Jones willfully, intentionally, and knowingly used service marks and designations identical to and confusingly similar to the LIGHTHOUSE Marks in violation of Section 32 of the Lanham Act, 15 U.S.C. § 1114.

55.     Guarantors caused or were complicit in Jones' infringing activity.  They are therefore contributory infringers in violation of the Lanham Act.

56.     The defendants' conduct has caused and continues to cause irreparable injury to the reputation and goodwill of Lighthouse, which will continue unabated unless enjoined by this Court.

57.     In addition, the defendants' conduct has caused monetary damage to Lighthouse in an amount to be proved at trial.

## <u>COUNT FOUR</u>

### (Federal Unfair Competition)

58.     Lighthouse realleges Paragraphs 1 - 56 of this Complaint.

59.     Jones' unauthorized use of the LIGHTHOUSE Marks, and holding itself out as duly licensed member of the LIGHTHOUSE System, constitutes false designation of origin, false or misleading descriptions of fact, and false or misleading representations of fact, which are likely to cause confusion or mistake, or to deceive as to the affiliation, connection, or association between Jones and Lighthouse, or as to the origin, sponsorship, or approval of the goods or services being offered by Jones, or as to Lighthouse's approval of Jones' commercial activities.

60.     Jones' conduct violates Section 43(a) of the Lanham Act, 15 U.S.C. § 1125 (a).

61.     Guarantors caused or were complicit in Jones' infringing activity.  They are therefore contributory infringers in violation of the Lanham Act.

62.     The defendants' conduct is causing irreparable injury to Lighthouse's reputation and goodwill, which will continue unabated unless enjoined by this Court.

142687v1

63.     In addition, the defendants' conduct is causing monetary damage to Lighthouse in an amount to be proven at trial.

## COUNT FIVE

### (Common law unfair competition)

64.     Lighthouse realleges Paragraphs 1 – 62 of this Complaint.

65.     The defendants' conduct constitutes unfair competition under applicable state law.

66.     The defendants' conduct is causing irreparable injury to Lighthouse's reputation and goodwill, which will continue unabated unless enjoined by this Court.  In addition, Jones' conduct is causing monetary damage to Lighthouse in an amount to be proven at trial.

## PAYER FOR RELIEF

**WHEREFORE**, Lighthouse demands entry of judgment in its favor awarding the following relief:

1.      Preliminarily and permanently enjoining Jones and Guarantors, and all those acting in concert or privity with any or all of them, including any of their agents, servants, employees, and attorneys, from:

(a)     directly or indirectly owning, maintaining, operating, engaging in, being employed by, or having any interest in, a business which provides outdoor lighting services or products within ten (10) miles of any location within the cities of Amarillo, Texas, Lubbock, Texas, or Midland, Texas for a period of two (2) years from the date of the order enjoining that conduct;

(b)     using the LIGHTHOUSE Marks or the LIGHTHOUSE System, in any manner whatsoever, including, without limitation, in connection with the advertising, promotion or sale of any product or service, and including, without limitation, all signs, furniture, fixtures, equipment, advertising materials, photographs, customer reviews and testimonials, stationary, forms, and any other articles that display the LIGHTHOUSE Marks or was created or used in connection with the LIGHTHOUSE Marks;

(c)     operating or doing business under any name or mark, or in any manner that is likely to give the public the impression that any business in which Jones has any

interest or connection is licensed by LIGHTHOUSE or otherwise associated with the LIGHTHOUSE System;

(d)    failing to turn over to LIGHTHOUSE all manuals, records, files, instructions, correspondence and other materials relating to Jones' operation of the Franchised Business as a LIGHTHOUSE LANDSCAPE LIGHTING franchised business; and

(e)    committing any other act that infringes the LIGHTHOUSE Marks or otherwise unfairly competes with Lighthouse or the LIGHTHOUSE System;

2.    Ordering the defendants to file with the Court and serve on counsel for Lighthouse, within five (5) calendar days after service of any injunction issued herein, a written report setting forth in detail, under oath, the manner and form in which it has complied with such injunction;

3.    Ordering specific performance against Jones and Guarantors of the post-termination obligations in the Franchise Agreement, including but not limited to ordering Jones and Guarantors to comply with the post-expiration covenant not to compete and ordering Jones to transfer to Lighthouse all telephone numbers and online accounts used by Jones in operating the Franchised Business;

4.    That Jones be ordered to provide an accounting of his Total Gross Revenues from operation of the Franchised Business and the royalty fees due to Lighthouse on those Total Gross Revenues pursuant to the Franchise Agreement and that Lighthouse be awarded that amount as damages for Jones breach of the Franchise Agreement, plus interest through the date of entry of judgment and late fees pursuant to the Franchise Agreement;

5.    That Jones be ordered to provide an accounting pursuant to 15 U.S.C.A. §1117(a), of his profits from his competing business and that these profits be awarded to Lighthouse, along with all other damages for Jones' violation of Lighthouse's trademark rights, trebled in

accordance with 15 U.S.C.A. §1117(a), plus interest through the date of entry of judgment and the costs of this action;

6.      Awarding Lighthouse its damages from Jones' breach of his post-expiration contractual obligations, in an amount to be proved at trial, plus interest through the date of entry of judgment;

7.      Awarding Lighthouse its attorneys' fees incurred in this action pursuant to 15 U.S.C. 1117(a) and (b) and the terms of the Franchise Agreement; and

8.      Such other and further relief as the Court may deem appropriate.

RINEY & MAYFIELD LLP

Thomas C. Riney – TBN 16935100
triney@rineymayfield.com
Mitzi S. Mayfield – TBN 13284425
mmayfield@rineymayfield.com
320 South Polk Street, Suite 600
Maxor Building
Amarillo, Texas 79101
(806) 468-3200; Fax (806) 376-4509

          */s/ Mitzi S. Mayfield*
By:_____
      Mitzi S. Mayfield


PLAVE KOCH PLC

Benjamin B. Reed (to be admitted *pro hac vice)*
breed@plavekoch.com
12005 Sunrise Valley Drive, Suite 200
Reston, VA  20191-3492
 (703) 774-1207; Fax:   (703) 774-1201

*Attorneys for Plaintiff Lighthouse Franchise
Systems, LLC*


August 8, 2017


142687v1

# EXHIBIT 1

# LIGHTHOUSE LANDSCAPE LIGHTING FRANCHISOR, INC.

# FRANCHISE AGREEMENT

## Table of Contents

| | | |
|---|---|---|
| 1 | Grant of Franchise | 1 |
| 2 | Franchisee's Development Obligation | 2 |
| 3 | Term and Renewal | 3 |
| 4 | Payments by Franchisee | 4 |
| 5 | Training and Assistance | 5 |
| 6 | Duties of Franchisee | 6 |
| 7 | Technology | 9 |
| 8 | Proprietary Marks | 12 |
| 9 | Manual | 13 |
| 10 | Confidential Information | 14 |
| 11 | Accounting and Records | 14 |
| 12 | Advertising | 16 |
| 13 | Transferability | 17 |
| 14 | Termination | 21 |
| 15 | Obligations upon Termination or Expiration | 23 |
| 16 | Covenants | 25 |
| 17 | Applicable Law and Dispute Resolution | 27 |
| 18 | Independent Contractor | 28 |
| 19 | Insurance | 29 |
| 20 | Indemnification | 30 |
| 21 | General Provisions | 31 |
| 22 | Severability and Construction | 32 |
| 23 | Force Majeure | 33 |
| 24 | Acknowledgment | 34 |

| | | |
|---|---|---|
| Exhibit A - | Protected Territory | |
| Exhibit B - | Sample form of Franchisee Employees' Non-Competition and Non-Disclosure Agreement | |
| Exhibit C - | Guarantee, Indemnification, and Acknowledgment | |
| Exhibit D - | List of Principals in Franchisee | |
| Exhibit E - | Authorization Agreement for Prearranged Payments (Direct Debit) | |

## LIGHTHOUSE LANDSCAPE LIGHTING

## FRANCHISE AGREEMENT

**THIS FRANCHISE AGREEMENT** (the "**Agreement**") is made and entered into this _____ day of _____, 201____ (the "**Signature Date**") by and between:

- Lighthouse Landscape Lighting Franchisor, Inc., a Maryland corporation, having its principal place of business at 2112 Crown Drive, St. Augustine, Florida 32092 ("**Franchisor**"); and

- _____, a [resident of] [corporation organized in] [limited liability company organized in] _____, having its principal offices at _____ ("**Franchisee**").

RECITALS:

A. Franchisor, as the result of the expenditure of time, skill, effort and money, has developed and owns a distinctive system (the "**LLL System**") for the establishment, development, operation and maintenance of business operations which provide the sale and service of landscape lighting products, installation and services that use Franchisor's LLL System and Proprietary Marks (a business that uses Franchisor's LLL System and Proprietary Marks is referred to in this Agreement as a "**Landscape Lighting Business**"), all of which Franchisor may periodically change, improve, and/or further develop;

B. Franchisor is the owner and operator of certain rights and interests in and to the "Lighthouse Landscape Lighting" name and such other trademarks, trade names, service marks, logotypes, insignias, trade dress and designs used in connection with the development, operation and maintenance of the Landscape Lighting Business (together, the "**Proprietary Marks**");

C. Franchisor grants to qualified persons franchises to own and operate Landscape Lighting Businesses offering landscape lights products, installation and services utilizing the LLL System and Proprietary Marks within a designated area;

D. Franchisee wishes to operate a Landscape Lighting Business and has applied for a franchise, and Franchisor has approved that application relying up on the information given, and representations that Franchisee made, in the application;

In consideration of the promises and the commitments in this Agreement, and for other good and valuable consideration, the sufficiency and receipt of which are hereby acknowledged, the parties hereby agree as follows:

## 1    GRANT OF FRANCHISE

1.1    *Grant of Franchise.*   Upon the terms and conditions set forth in this Agreement, Franchisor hereby grants to Franchisee the right and franchise, and Franchisee hereby accepts and undertakes the obligation, to:

1.1.1    Establish and operate one (1) Landscape Lighting Business under the LLL System within the Protected Territory (as defined in Section 1.2 below);

1.1.2    Use the Proprietary Marks and LLL System to operate the Landscape Lighting Business within the Protected Territory.

1.2     *Protected Territory.*  During the term of this Agreement, except as otherwise provided in Section 1.3 below, Franchisor shall not establish, nor license any other person to establish, another Landscape Lighting Business at any location within the "Protected Territory."  The Protected Territory shall be the area that is specified in writing in Exhibit A to this Agreement.

1.3     *Exception to the Protected Territory.*  Franchisor retains all other rights other than those granted to Franchisee under Section 1.2 above.  Among other things, Franchisor shall retain the right:

    1.3.1   to acquire (and be acquired by) another outdoor lighting business, and to grant licenses to the Acquired Business' operations (together, an "**Acquired Business**"), on any terms and conditions Franchisor deems advisable, and without granting Franchisee any rights in the Acquired Business, on the following conditions:

        (a)     The Acquired Business must use trademarks that are not the Proprietary Marks and a system that is not the LLL System; and

        (b)     The Acquired Business may offer or sell products and services at or from the Acquired Business that are similar to or different from the products and services offered by the Landscape Lighting Business and may be located within or outside the Protected Territory, despite how close those businesses may be to Franchisee's Landscape Lighting Business(es).

    1.3.2   to offer and sell, or license any third party to offer and sell, the Holiday Bright Lights System ("**Holiday Bright Lights**") and/or Smart Dog Fencing System ("**Smart Dog**") lines of business, if Franchisee declines to operate, or, in Franchisor's reasonable business judgment, Franchisee does not adequately develop new business for Holiday Bright Lights and/or Smart Dog systems.

1.4     *Limit on Sales.*  Franchisee shall offer and sell landscape lighting products, installation and services from the Landscape Lighting Business, and only in accordance with the requirements of this Agreement and the procedures set forth in the Manuals, and only to end-user customers.  Franchisee shall not sell products to wholesale customers or otherwise for resale.  Franchisee shall not offer or sell services or products through any other means, including without limitation, sales or mail order catalogs, temporary locations, the Internet, or through any other electronic media.

1.5     *Variation of Standards.*  Franchisee acknowledges and agrees that because complete and detailed uniformity under many varying conditions may not be possible or practical, Franchisor shall have the right to vary standards for any Landscape Lighting Business (based, among other things, upon Franchisor's right to determine that as to the circumstances applicable to any particular site, such as density of population, business potential, population of trade area, existing business practices, and/or any other condition that Franchisor deems to be of importance to the successful operation of any particular Landscape Lighting Business).  Franchisee shall have no right to require Franchisor to disclose or grant to Franchisee a like or similar variation hereunder; further, nothing in connection with Franchisor's grant of a franchise, or the nature of the franchise relationship with any other franchisee, shall have an effect upon, or constitute a breach of, any obligations under this Agreement (however, this clause shall not supersede Franchisor's obligations with respect to the Protected Territory as specified in Section 1.2 above).

## 2     FRANCHISEE'S DEVELOPMENT OBLIGATION

2.1     *Minimum Development Obligation.*  Franchisee hereby agrees to equip, open and thereafter continue to operate the Landscape Lighting Business within the Protected Territory within ninety (90) days after signing this Agreement (the "**Development Period**") (this obligation is also referred to in this Agreement as the "**Minimum Development Obligation**").

2.2   *Minimum Revenue Requirements*.   The Landscape Lighting Business shall be required to generate a minimum of:  (a) Seventy Five Thousand Dollars ($75,000) in Total Gross Revenue (as defined in Section 4.2.1 below) for the twelve-calendar month period starting one year after the first sale by the Landscape Lighting Business established by Franchisee; and (b) One Hundred Thousand Dollars ($100,000) in Total Gross Revenue in each subsequent twelve (12) calendar month period.

## 3   TERM AND RENEWAL

3.1   *Term*.   The term of this Agreement (the "**Term**") shall start on the Signature Date and, unless sooner terminated in accordance with the terms of this Agreement, shall expire on the five (5) year anniversary of the Signature Date.

3.2   *Renewal*.   Franchisee may, at its option, with respect to the Landscape Lighting Business in operation at the expiration of the Term, elect to renew this Agreement for:  (a) one (1) additional term of five (5) years (the "**Initial Renewal Term**"); and (b) subsequent additional five (5) year terms but only if mutually agreed upon in writing by both Franchisor and Franchisee. Franchisee's optional right to renew this Agreement for the Initial Renewal Term is subject to the following conditions, all of which must be met before renewal:

3.2.1   Franchisee shall give Franchisor written notice of Franchisee's election to renew this Agreement for the Initial Renewal Term not less than ninety (90) days nor more than one hundred eighty (180) days prior to the end of the initial five (5) year term;

3.2.2   Franchisee shall not be in default of any provision of this Agreement, any amendment to this Agreement,  any successor to this Agreement, or any other agreement between Franchisee and Franchisor or any of its subsidiaries or affiliates; and, in Franchisor's reasonable judgment, Franchisee shall have substantially complied with all the items and conditions of this Agreement, such other agreements, as well as the operating standards prescribed by Franchisor during the Term of this Agreement;

3.2.3   Franchisee shall have satisfied all monetary obligations owed by Franchisee to Franchisor and its subsidiaries and affiliates and shall have timely met those obligations throughout the Term of this Agreement;

3.2.4   Franchisee shall execute, upon renewal, Franchisor's then-current form of franchise agreement (with appropriate modification to reflect the fact that the agreement relates to the grant of a renewal franchise), which agreement shall supersede this Agreement in all respects, and the terms, conditions, obligations and provisions of which may differ from the terms, conditions, obligations and provisions of this Agreement in all respects (including, without limitation, a higher percentage royalty fee, Advertising Commitment, and/or a different Protected Territory); provided, however, Franchisee shall not be required to pay the then-current initial franchise fee or its equivalent.  ("Then-current," as used in this Agreement shall mean the form then currently provided to prospective franchisees, or if not then being so provided, then such form selected by the Franchisor in its sole discretion which previously has been delivered to and executed by a franchisee of Franchisor).  Franchisor agrees, however, that any changes will not be unreasonable nor alter any of the basic relationships of this Agreement nor the fundamental relationship between Franchisor and Franchisee;

3.2.5   Franchisee and its principals shall execute a general release, in a reasonable form prescribed by Franchisor, of any and all claims against Franchisor and its subsidiaries and affiliates, and their respective officers, directors, agents, and employees;

3.2.6 Franchisee shall comply with Franchisor's then-current qualification and training requirements;

3.2.7 Before the expiration of the initial five (5) year term, Franchisee has brought the Landscape Lighting Business into full compliance with the specifications and standards then applicable for new or renewing Landscape Lighting Businesses;

3.2.8 Franchisee shall be current with respect to its obligations to the vendors with whom it does business, including but not limited to its lessor, banks, and any others with whom it does business; and

3.2.9 Franchisee shall pay Franchisor, instead of an initial franchise fee, a renewal fee of One Thousand Dollars ($1,000).

## 4   <u>PAYMENTS BY FRANCHISEE</u>

4.1 *Franchise Fee*. Franchisee shall pay to Franchisor in cash or by certified check the sum of Twenty Thousand Dollars ($20,000) (the "**Franchise Fee**"). The Franchise Fee is non-refundable in consideration of administrative and other expenses incurred by Franchisor in granting this franchise and for Franchisor's lost or deferred opportunity to franchise others.

4.2 *Royalty Fees*. During the Term of this Agreement, Franchisee shall pay to Franchisor a continuing royalty fee up to seven percent (7%) of Total Gross Revenue (the "**Royalty Fees**") of the Landscape Lighting Business. Royalty Fees shall be paid by Franchisee on a monthly basis, within ten (10) days after the end of each calendar month during the Term or at such other time as Franchisor may determine, in its sole discretion (if the 10th day of the month is a holiday that prevents payment being made on that day, then payment may be made on the immediate following business day). Franchisee's obligation to pay the Royalty Fees shall not be subordinated to any other obligation of Franchisee, whether under this Agreement or otherwise. Royalty Fees shall be paid without any offset, credit or deduction.

4.2.1 As used in this Agreement, the term "**Total Gross Revenue**" means all revenue from the sale of all merchandise, products, and/or services, and all other income of every kind and nature related to, derived from, or originating from the Landscape Lighting Business, including proceeds of any business interruption insurance policies, whether at retail or wholesale (whether such sales are permitted or not), whether for cash, check, or credit, and regardless of collection in the case of check or credit; provided, however, that "Total Gross Revenue" shall exclude any customer refunds, discounts given, and sales or other taxes collected from customers and remitted by Franchisee to the appropriate taxing authorities. Regardless of whether final payment has been received by Franchisee, Total Gross Revenue shall be deemed to be received by Franchisee at the time any service or product which give rise to the payment is delivered and shall be valued at the prices in effect at the time such products or services are received.

4.3 *Payment Method*. Franchisee shall establish an arrangement for electronic funds transfer or deposit of any payments required under Section 4 and if applicable, Section 12 of this Agreement or, at Franchisor's written request, by credit card arrangement. Franchisee shall execute Franchisor's current form of "Authorization Agreement for Prearranged Payments (Direct Debits)," a copy of which is attached to this Agreement as Exhibit E, and Franchisee shall comply with the payment and reporting procedures specified by Franchisor in the Manual. (If electronic funds transfer is made impossible for any reason, Franchisee agrees that it shall comply with Franchisor's reasonable written directions for transmitting payment in a different manner.) Franchisee agrees that it will, at all times, maintain in its bank account as to which the electronic

fund transfer authorization applies a balance that is sufficient to pay all then-due charges owed to Franchisor.

4.4     *Sales Reports.*   During the Term of this Agreement, Franchisee shall submit to Franchisor, together with the Royalty Fees, a report, run from the Landscape Lighting Business' software program required by Section 7 below, which reports Total Gross Revenue, in the form and as required by the Manual.

4.5     *Overdue Payments and Reports.*   Any payment or report not actually received by Franchisor on or before such date shall be deemed overdue.  If any payment is overdue, Franchisee shall pay Franchisor, in addition to the overdue amount, interest on such amount from the date it was due until paid, at the rate which is two percentage points (200 basis points) above the Prime Rate as published in *The Wall Street Journal* on the date payment was due, or the maximum rate permitted by law, whichever is less.   In addition, Franchisee shall pay Franchisor a late administrative fee of One Hundred Dollars ($100) (the "**Late Fee**") to partially reimburse Franchisor for the administrative and handling cost of any late payments.  Entitlement to interest shall be in addition to any other remedies Franchisor may have.  Franchisee acknowledges that nothing in this Agreement constitutes Franchisor's agreement to accept any payments after those payments are due or a commitment by Franchisor to extend credit to or otherwise finance Franchisee's operation of the Landscape Lighting Business.   Additionally, Franchisee acknowledges that its failure to pay all amounts when due shall constitute a material default, and grounds for termination, of this Agreement.

4.6     *Allocation of Payments.*   Franchisor shall have the right to apply any payments by Franchisee to any past due indebtedness of Franchisee for Royalty Fees, Advertising Commitment, purchases from Franchisor and its affiliates, interest or any other indebtedness, despite any other allocation by Franchisee.

4.7     *Additional Payments.*   Franchisee shall pay to Franchisor, within fifteen (15) days of any written request by Franchisor which is accompanied by reasonable substantiating materials, any monies which Franchisor has paid, or has become obligated to pay, on behalf of Franchisee, by consent or otherwise under this Agreement.

4.8     *Obligations to Other Parties.*   Franchisee shall pay when due all of its vendors and other trade creditors (however, nothing in this provision shall preclude Franchisee from a *bona fide* disagreement or dispute with a vendor over charges or fees, which Franchisee agrees it shall address and resolve promptly and professionally).

5       **TRAINING AND ASSISTANCE**

5.1     *Initial Training.*   Franchisor shall make training available to Franchisee (or if Franchisee is an Entity (defined below), to Franchisee's "Designated Principal"), Franchisee's operations manager (who must be a person to whom Franchisor does not have at any time a reasonable objection to his or her service in that capacity), and two (2) other persons designated by Franchisee (together, the "**Trainees**").   Each of the Trainees must attend and successfully complete, to Franchisor's reasonable satisfaction, no later than thirty (30) days after the execution of this Agreement, a training and familiarization course to be conducted at Franchisor's headquarters or at such other place as Franchisor may reasonably designate.   All expenses incurred by the Trainees in attending such programs, including without limitation, travel costs, room and board expenses and employees' salaries, shall be the sole responsibility of Franchisee.

5.2     *Refresher Training.*  Franchisor from time to time may provide, and if it does may require that previously trained Franchisees or their managers or employees attend and successfully complete, refresher training programs or seminars to be conducted at such location as may be

designated by Franchisor.  Attendance at such refresher training programs or seminars shall be at Franchisee's sole expense.

5.3   *Seminar/Conference*.  Franchisee, its Designated Principal (as defined below) and its managers are strongly encouraged to attend any of Franchisor's seminars, conventions, and/or conferences.  Notwithstanding the above, Franchisee and/or its Designated Principal must attend the annual conference held by Franchisor, if Franchisor decides to hold an annual conference.

5.4   *New or Additional Manager*.  If Franchisee designates new or additional managers after the initial training program, Franchisor shall provide training to such managers to the extent Franchisor can reasonably accommodate such managers in Franchisor's regularly scheduled training course.  Franchisor shall provide such training at no charge to Franchisee, except that Franchisee shall pay all employee salaries and travel and living expenses incurred by Franchisee's managers or employees in attending such training programs.

5.5   *Designated Principal*.  If Franchisee is an Entity (defined below), then the training to the provided to "Franchisee" shall be provided to Franchisee's Designated Principal, as set forth in Section 5.1 above.  The term "Entity" is understood and agreed to mean a corporation, limited liability company, limited liability partnership, or any other form of juridical entity other than an individual acting in his or her personal capacity.  If Franchisee is an Entity, then Franchisee shall designate one of its Principals to serve as the "Designated Principal;" provided that the individual so chosen must be a person to whom Franchisor does not have at any time a reasonable objection to his or her service in that capacity.  The Designated Principal shall at all times be fully responsible for the management of Landscape Lighting Business.

5.6   *Newsletter*.  Franchisor will provide Franchisee with a copy of any newsletter published by the Franchisor.

5.7   *Phone Support*.  Franchisor will provide phone support and assistance in an ongoing basis.

5.8   *Advertising Materials*.  Franchise may provide assistance in training and developing advertising and promotional materials and, to the extent available from Franchisor, providing advertising materials which Franchisee may purchase at their sole discretion

5.9   *Purchase Assistance*.  Franchisor may provide Franchisee with lists of products and materials available from certain approved vendors for ordering by Franchisee, at Franchisee's discretion.  Franchisor will receive orders from Franchisee and place orders on behalf of Franchisee in the event Franchisee utilizes certain vendors made available by Franchisor.  Franchisee may choose to order from such approved vendors, or from other vendors approved by Franchisor pursuant to Section 6.10 of this Agreement.

6   **DUTIES OF FRANCHISEE**

6.1   *Full Efforts*.  Franchisee shall develop the Landscape Lighting Business using the LLL System and the officers, directors, or members, as the case may be, shall devote their full time and attention to the Landscape Lighting Business and shall diligently promote the Landscape Lighting Business, and shall not engage in any business or other activities that will conflict with its obligations under this Agreement.  Franchisee shall at all times (and ensure that its employees at all times) treat all customers and vendors of Landscape Lighting Business, as well as Franchisor and other franchisees under the LLL System, with the highest degree of care and respect

6.2   *System Standards*.  Franchisee shall comply with all standards, specifications, processes, procedures, and requirements in effect, and as may be in effect at any time in the future, regarding the operation of the Landscape Lighting Business, including all requirements in the Manual as amended from time to time by Franchisor.

6.3     *No Harmful Practices.*  Franchisee shall not engage in any trade practice or other activity or sell any product or literature which is harmful to the goodwill or reflects unfavorably on the reputation of the Franchisee, the Franchisor, the Landscape Lighting Business or the products or services sold by the Landscape Lighting Business, or constitute deceptive or unfair competition, or otherwise is a violation of any applicable law.

6.4     *Non-Competition Agreement.*  Franchisee shall require all employees to execute the Non-Competition Agreement attached to this Agreement as Exhibit B prior to the training of said employees, and deliver a copy of the executed Non-Competition Agreement to Franchisor.

6.5     *Use of Premises.*  Franchisee shall use the Landscape Lighting Business solely for the operation of the Landscape Lighting Business; keep the business open and in normal operation for such minimum hours and days as Franchisor may from time to time specify in the Manual or as Franchisor may otherwise approve in writing (subject to local ordinances or other applicable restrictions, if any); and refrain from using or permitting the use of any Proprietary Marks for any other purpose or activity at any time without first obtaining the written consent of the Franchisor.

6.6     *Compliance with Laws; Permits.*  Franchisee shall comply, at Franchisee's expense, with all applicable federal, state, and local laws, rules, and regulations, and shall timely obtain any and all permits, certificates, or licenses necessary for the full and proper conduct of the business franchised under this Agreement, including, without limitation, licenses to do business, sanitation permits, fictitious name registrations, sales tax permits, and fire clearances.  To the extent that the requirements of said laws are in conflict with the terms of this Agreement, the Manuals, or other instructions of Franchisor, Franchisee shall:  (a) comply with said laws; and (b) immediately provide written notice describing the nature of such conflict to Franchisor.

6.7     *Taxes.*  Franchisee shall promptly pay when due all taxes levied or assessed, including, without limitation, unemployment and sales taxes, and all accounts and other indebtedness of every kind incurred by Franchisee in the conduct of the business franchised under this Agreement. Franchisee shall pay Franchisor an amount equal to any sales tax, gross receipts tax, or similar tax (other than income tax) imposed on Franchisor with respect to any payments to Franchisor required under this Agreement, unless the tax is credited against income tax otherwise payable by Franchisor.  In the event of any bona fide dispute as to Franchisee's liability for taxes assessed or other indebtedness, Franchisee may contest the validity or the amount of the tax or indebtedness in accordance with procedures of the taxing authority or applicable law; however, in no event shall Franchisee permit a tax sale or seizure by levy of execution or similar writ or warrant, or attachment by a creditor, to occur against the premises of the Landscape Lighting Business or the equipment used therein.

6.8     *Supplies.*  Franchisee shall maintain in sufficient supply, and use and/or sell at all times only such items, supplies, packaging, displays, boxes, bags, labels, forms, other paper products, and materials that conform to Franchisor's written standards and specifications, and to refrain from deviating therefrom by the use or offer of any nonconforming items without Franchisor's specific prior written approval.

6.9     *Equipment.*  Franchisee shall purchase and have in operation necessary equipment in order to operate the Landscape Lighting Business in accordance with the specifications and standards set by Franchise, including but not limited to the Computer System and Required Software (as defined below in Section 7 of this Agreement), cellular phone, a vehicle available for business use (and such additional identification as may be required under Section 8.2 below.)

6.10    *Approved Vendors.*  Franchisor shall have the right to require that certain equipment, fixtures, furnishings, supplies, and other products and materials required for the operation of the Landscape Lighting Business be purchased solely from suppliers (including manufacturers, distributors, and other sources), who demonstrate, to the continuing reasonable satisfaction of Franchisor, the ability to meet Franchisor's then-current standards and specifications for such

items; who possess adequate quality controls and capacity to supply Franchisee's needs promptly and reliably; and who have first been approved in writing by Franchisor and not thereafter withdrawn from the approved supplier list.  Such items shall include, but not be limited to, light fixtures and the wiring.  If Franchisee desires to purchase any items from an unapproved supplier, Franchisee shall submit to Franchisor a written request for such approval, and have such supplier acknowledge in writing that Franchisee is an independent entity from Franchisor and that Franchisor is not liable for debts incurred by Franchisee.  Franchisor shall have the right to require that its representatives be permitted to inspect the supplier's facilities, and that samples from the supplier be delivered, at Franchisor's option, either to Franchisor or to an independent, certified laboratory designated by Franchisor for such testing.  A charge not to exceed the reasonable cost of the inspection and the actual cost of the test shall be paid by Franchisee or the supplier.  Franchisor may also require that the supplier comply with such other reasonable requirements as Franchisor may deem appropriate, including payment of reasonable continuing inspection fees and administrative costs.  Franchisor reserves the right, at its option, to reinspect the facilities and products of any such approved supplier and to revoke its approval upon the supplier's failure to continue to meet any of Franchisor's then-current criteria.  If, in providing services to Franchisee, any third party may obtain access to confidential information as provided in Section 9 below, Franchisor may require, as a condition of approval of such provider, the execution of covenants of non-disclosure, non-solicitation and non-competition in a form satisfactory to Franchisor.

6.11    *Trademarked Products.*

6.11.1.    Franchisor shall have the right, but not the obligation, to develop and offer a proprietary line of proprietary products ("**Trademarked Products**").  If Franchisor develops and offers Trademarked Products, Franchisee acknowledges that it shall purchase Trademarked Products only from Franchisor or such vendor(s) that Franchisor may designate in writing.

6.11.2.    In addition to the terms of Section 1.3.2 above, Franchisee acknowledges and agrees that Franchisor shall have the option to offer or not offer Franchisee the Holiday Bright Lights and Smart Dog lines of business.

6.12    *Modification of the LLL System.*  Franchisee recognizes and agrees that from time to time hereafter Franchisor may change or modify the LLL System presently identified by the Proprietary Marks, including, without limitation, the adoption and use of new, different or modified trade names, trademarks, service marks or copyrighted materials, new products, new equipment or new techniques.  Upon direction of Franchisor, Franchisee shall immediately discontinue its use of any part of the LLL System and accept, use and display for the purpose of this Agreement any additions to the LLL System, as if they were part of this Agreement at the time of execution hereof.  Franchisee shall make such expenditures as are reasonably required by such changes or modifications in the LLL System.  Franchisee shall not change, modify or alter the LLL System in any way.

6.13    *Franchisee Entity.*  If Franchisee is or becomes a corporation, limited liability company, limited liability partnership, or partnership, or other juridical entity (together, an "**Entity**"), the Entity shall comply with the following requirements:

6.12.1    Subject to 6.7 above, Franchisee shall confine its activities to the establishment and operation of the Landscape Lighting Business.

6.12.2    Franchisee's partnership agreement, operating agreement, or Articles of Incorporation and Bylaws (or comparable governing documents) shall at all times provide that its activities are confined exclusively to operation of the Landscape Lighting Business and that the issuance and transfer of voting stock, or other ownership interest therein, is restricted by the terms of this Agreement.

6.12.3   Franchisee shall furnish Franchisor promptly upon request copies of Franchisee's partnership agreement, operating agreement, or Articles of Incorporation, Bylaws, and other governing documents, and any other documents Franchisor may reasonably request, and any amendments thereto.

6.12.4   Franchisee shall maintain stop-transfer instructions against the transfer on its records of any securities except in accordance with the provisions of Section 13 below.  All securities issued by Franchisee shall bear the following legend, which shall be printed legibly and conspicuously on each stock certificate or other evidence of ownership interest:

> "The transfer of these securities is subject to the terms and conditions of a Franchise Agreement with Franchisor dated _____.  Reference is made to said Agreement and to the restrictive provisions of the Articles and Bylaws of this [Corporation]."

6.12.5   Franchisee shall maintain a current list of all general and limited partners, or members, or all owners of record and all beneficial owners of any class of voting stock of Franchisee (or other ownership interest) and shall furnish the list to Franchisor upon request.

6.14   *Guarantee*.  Each individual who holds a five percent (5%) or greater ownership interest in Franchisee (including each individual holding a 5% or greater interest in any partnership, limited liability company or corporation having a controlling interest in Franchisee) shall enter into a continuing guarantee agreement under seal, in a form satisfactory to Franchisor, assuming and agreeing to discharge all of the obligations of Franchisee under this Agreement in the form attached hereto as Exhibit C.

6.15   *Subordination of Other Obligations*.  All debts of Franchisee, including but not limited to bank loans, must be subordinated to any debts or other obligations owed by Franchisee to Franchisor whether under this Agreement or otherwise.

6.16   *Notice of Government Actions*.  Franchisee shall notify Franchisor in writing within five (5) days of the commencement of any action, suit, or proceeding, and of the issuance, against Franchisee, any of its principal or employees, or the Landscape Lighting Business, of any subpoena, order, writ, injunction, award or decree of any court, agency, or other governmental instrumentality, or within five (5) days after occurrence of any accident or injury which may adversely affect the operation of the Landscape Lighting Business or the financial condition of Franchisee, or give rise to liability or a claim against Franchisee or Franchisor

## 7   TECHNOLOGY

7.1   *Data*.  All data provided by Franchisee, uploaded to Franchisor's system from the Franchisee's system, and/or downloaded from the Franchisee's system to Franchisor's system is and will be owned exclusively by Franchisor, and Franchisor will have the right to use such data in any manner that Franchisor deems appropriate without compensation to Franchisee.  In addition, all other data created or collected by Franchisee in connection with the System, or in connection with Franchisee's operation of the business (including but not limited to consumer and transaction data), is and will be owned exclusively by Franchisor during the term of, and following termination or expiration of, this Agreement.  Franchisor has the right to download or gain access to Franchisee's computer system.  Copies and/or originals of such data must be provided to Franchisor upon Franchisor's request.  Franchisor hereby licenses use of such data back to Franchisee, at no additional cost, solely for the term of this Agreement and solely for Franchisee's use in connection with the business franchised under this Agreement.

7.2    *Privacy.*  Franchisor may, from time-to-time, specify in the Manual or otherwise in writing the information that Franchisee shall collect and maintain on the Computer System installed at the Landscape Lighting Business, and Franchisee shall provide to Franchisor such reports as Franchisor may reasonably request from the data so collected and maintained.  All data pertaining to or derived from the Landscape Lighting Business (including without limitation data pertaining to or otherwise about Landscape Lighting Business customers) is and shall be the exclusive property of Franchisor, and Franchisor hereby grants a royalty-free non-exclusive license to Franchisee to use said data during the term of this Agreement.

   7.2.1    Franchisee shall abide by all applicable laws pertaining to the privacy of consumer, employee, and transactional information ("**Privacy Laws**").

   7.2.2    Franchisee shall comply with Franchisor's standards and policies pertaining to Privacy Laws.  If there is a conflict between Franchisor's standards and policies pertaining to Privacy Laws and actual applicable law, Franchisee shall:  (a) comply with the requirements of applicable law; (b) immediately give Franchisor written notice of said conflict; and (c) promptly and fully cooperate with Franchisor and Franchisor's counsel in determining the most effective way, if any, to meet Franchisor's standards and policies pertaining to Privacy Laws within the bounds of applicable law.

   7.2.3    Franchisee shall not publish, disseminate, implement, revise, or rescind a data privacy policy without Franchisor's prior written consent as to said policy.

7.3    *Websites.*  Unless otherwise approved in writing by Franchisor, Franchisee shall not establish a separate Website, but shall only have one or more references or webpage(s), as designated and approved in advance by Franchisor, within Franchisor's Website (the term "**Website**" is agreed to mean one or more related documents, designs, or other communications that can be accessed through electronic means (including but not limited to the Internet, World Wide Web, and social networking sites like Facebook, Twitter, LinkedIn, blogs, vlogs, and other applications, etc.). However, if Franchisor approves, in writing, a separate Website for Franchisee (which Franchisor is not obligated to approve), then each of the following provisions shall apply:

   7.3.1    Franchisee specifically acknowledges and agrees that any Website owned or maintained by or for the benefit of Franchisee shall be deemed "advertising" under this Agreement, and will be subject to (among other things) Franchisor's approval under Section 12.2 below.

   7.3.2    Franchisee shall not establish or use any Website without Franchisor's prior written approval.

   7.3.3    Before establishing any Website, Franchisee shall submit to Franchisor, for Franchisor's prior written approval, a sample of the proposed Website domain name, format, visible content (including, without limitation, proposed screen shots), and non-visible content (including, without limitation, meta tags) in the form and manner Franchisor may reasonably require;

   7.3.4    Franchisee shall not use or modify such Website without Franchisor's prior written approval as to such proposed use or modification.

   7.3.5    In addition to any other applicable requirements, Franchisee shall comply with the Standards and specifications for Websites that Franchisor may periodically prescribe in the Manuals or otherwise in writing.

   7.3.6    If required by Franchisor, Franchisee shall establish such hyperlinks to Franchisor's Website and others as Franchisor may request in writing.

7.4     *Online Use of Marks and E-mail Solicitations.*  Franchisee shall not use the Proprietary Marks or any abbreviation or other name associated with Franchisor and/or the LLL System as part of any e mail address, domain name, and/or other identification of Franchisee in any electronic medium. Franchisee agrees not to transmit or cause any other party to transmit advertisements or solicitations by e-mail or other electronic media without first obtaining Franchisor's written consent as to:  (a) the content of such e-mail advertisements or solicitations; and (b) Franchisee's plan for transmitting such advertisements.   In addition to any other provision of this Agreement, Franchisee shall be solely responsible for compliance with any laws pertaining to sending e-mails including but not limited to the Controlling the Assault of Non-Solicited Pornography and Marketing Act of 2003 (known as the "CAN-SPAM Act of 2003").

7.5     *No Outsourcing without Prior Written Approval.*  Franchisee shall not hire third party or outside vendors to perform any services or obligations in connection with the Computer System, Required Software, or any other of Franchisee's obligations without Franchisor's prior written approval therefor.   Franchisor's consideration of any proposed outsourcing vendor(s) may be conditioned upon, among other things, such third party or outside vendor's entry into a confidentiality agreement with Franchisor and Franchisee in a form that is reasonably provided by Franchisor.   The provisions of this Section 7.5 are in addition to and not instead of any other provision of this Agreement.

7.6     *Changes to Technology.*  Franchisee and Franchisor acknowledge and agree that changes to technology are dynamic and not predictable within the term of this Agreement.  In order to provide for inevitable but unpredictable changes to technological needs and opportunities, Franchisee agrees that Franchisor shall have the right to establish, in writing, reasonable new standards for the implementation of technology in the LLL System; and Franchisee agrees that it shall abide by those reasonable new standards established by Franchisor as if this Section 7 were periodically revised by Franchisor for that purpose.

7.7     *E-Mail Communication.*  Franchisee acknowledges and agrees that exchanging information with Franchisor by e-mail is an important way to enable quick, effective, and efficient communication, and that Franchisor is entitled to rely upon Franchisee's use of e-mail for communicating as part of the economic bargain underlying this Agreement. To facilitate the use of e-mail to exchange information, Franchisee authorizes the transmission of e-mail by Franchisor and Franchisor's employees, vendors, and affiliates (on matters pertaining to the business contemplated hereunder) (together, "**Official Senders**") to Franchisee during the term of this Agreement.

  7.7.1     In order to implement the terms of this Section 7.7, Franchisee agrees that:  (a) Official Senders are authorized to send e-mails to those of Franchisee's employees as Franchisee may occasionally designate for the purpose of communicating with Franchisor; (b) it will cause its officers, directors, and employees (as a condition of their employment or position with Franchisee) to give their consent (in an e-mail, electronically, or in a pen-and-paper writing, as Franchisor may reasonably require) to Official Senders' transmission of e-mails to those persons, and that such persons shall not opt-out, or otherwise ask to no longer receive e-mails, from Official Senders during the time that such person works for or is affiliated with Franchisee; and (c) it will not opt-out, or otherwise ask to no longer receive e-mails, from Official Senders during the term of this Agreement.

  7.7.2     The consent given in this Section 7.7 shall not apply to the provision of notices by either party under this Agreement using e-mail unless the parties otherwise agree in a pen-and-paper writing signed by both parties.

8        **PROPRIETARY MARKS**

8.1      *Franchisee Acknowledgements.*

    8.1.1      Franchisee acknowledges that Franchisor owns all right, title and interest, together with all the goodwill, of the Proprietary Marks.  Franchisee further acknowledges that Franchisee's right to use the Proprietary Marks is derived solely from this Agreement and is limited to the conduct of business by Franchisee pursuant to and in compliance with this Agreement and all applicable standards, specifications, and operating procedures prescribed by Franchisor from time to time during the term of the Franchise.  Any unauthorized use of the Proprietary Marks by Franchisee shall constitute a breach of this Agreement and an infringement of Franchisor's rights in and to the Proprietary Marks.

    8.1.2      Franchisee acknowledges and agrees that all usage of the Proprietary Marks by Franchisee and any goodwill established by Franchisee's use of the Proprietary Marks shall inure to the exclusive benefit of Franchisor and its affiliates and that this Agreement does not confer any goodwill or other interests in the Proprietary Marks upon Franchisee.  Franchisee acknowledges, further, that it acquires no right, title or interest in any of the marks or any additional trademark which may be developed unless specifically granted such pursuant to the terms of a separate license agreement.  Franchisee shall not, at any time during the term of this Agreement or after its termination or expiration, contest the validity or ownership of any of the Proprietary Marks or assist any other person in contesting the validity or ownership of the Proprietary Marks.

8.2      *Usage of the Proprietary Marks.*  Franchisee shall not use the Proprietary Marks or any portion of any Proprietary Mark as part of its corporate or other legal name, or as part of any e-mail address, domain name, or other identification of Franchisee in any electronic medium, or with any prefix, suffix, or other modifying words, terms, designs, or symbols, or in any modified form.  Franchisee shall not use any Proprietary Mark in connection with the sale of any unauthorized product or service or in any other manner not expressly authorized in writing by Franchisor.  Franchisee agrees to properly attribute the ownership of the Proprietary Marks to Franchisor, or their respective affiliates, in such manner, and including such notices of trademark and service mark registrations, as Franchisor may periodically specify in writing.  Franchisee shall obtain and maintain such fictitious or assumed name registrations as may be required under applicable law.

8.3      *Actions involving the Proprietary Marks.*  Franchisee shall promptly notify Franchisor of any attempt that Franchisee knows of, or should know of, by any other person, firm, or corporation to use the Proprietary Marks or any colorable imitation thereof.  Upon receipt of timely notice of such infringement, Franchisor shall have the sole right to determine whether or not any action shall be taken on account of any such infringements or imitations.  Franchisor shall have the exclusive right to contest or bring action against any third party regarding the third party's use of any of the Proprietary Marks and shall exercise such right in their sole discretion.  Franchisee shall not institute any suit or take any actions with regards to the Proprietary Marks.  In any defense or prosecution of any litigation relating to the Proprietary Marks or components of the LLL System undertaken by Franchisor, Franchisee shall cooperate with Franchisor, in the manner and to the extent requested, and shall execute any and all documents and take all actions as may be desirable or necessary in the opinion of counsel, to carry out such defense or prosecution.  Except to the extent that such litigation is the result of Franchisee's use of the Proprietary Marks in a manner inconsistent with the terms of this Agreement, Franchisor agrees to reimburse Franchisee for its out of pocket costs in doing such acts and things, except that Franchisee shall bear the salary costs of its employees, and Franchisor shall bear the costs of any judgment or settlement.  However, if such litigation is the result of Franchisee's use of the Proprietary Marks in a manner inconsistent with the terms of this Agreement, then Franchisee agrees that it shall reimburse Franchisor for all of its out of pocket costs in defending the case, including but not limited to reasonable legal fees and related costs (such as trial costs, expert witnesses, and the like), and that Franchisee shall also bear the costs of any judgment or settlement.

8.4     *Substitution of Proprietary Marks.*  If it becomes advisable at any time, in Franchisor's sole discretion, for Franchisor to modify or discontinue use of any Proprietary Mark, and/or use one or more additional or substitute trade names, trademarks, service marks, or other commercial symbols, Franchisee agrees to comply with Franchisor's directions within a reasonable time after notice to Franchisee by Franchisor, and Franchisor shall have no liability or obligation whatsoever with respect to Franchisee's modification or discontinuance of any Proprietary Mark, or the costs associated with changing signs and other indicia at or in connection with the Landscape Lighting Business.

8.5     *Right to Inspect Landscape Lighting Business.*  In order to preserve the validity and integrity of the Proprietary Marks and copyrighted material licensed under this Agreement and to assure that Franchisee is properly employing the same in the operation of its Landscape Lighting Business, Franchisor or its agents shall have the right of entry and inspection of Franchisee's premises and operating procedures at all reasonable times.  Franchisor shall have the right to observe the manner in which Franchisee is rendering its services and conducting its operations, to confer with Franchisee's employees and customers, to inspect service techniques and procedures, to inspect inventory mix, and to evaluate products, supplies, accessories, and other items to make certain that the services, products, materials and supplies are satisfactory and meet the quality control provisions and performance standards established by Franchisor.

## 9      **MANUAL**

9.1     *The Manual.*  Franchisor shall provide to Franchisee, as described in Section 9.2 below, the "Lighthouse Landscape Lighting Operations Manual" (the "**Manual**").  As used in this Agreement, the term "Manual" includes the Landscape Lighthouse Lighting Operations Manual, other manuals, written directives, materials, and any other confidential communications provided or approved by Franchisor, whether or not such instructions are made part of the Operations Manual.  Franchisor shall have the right to amend and modify the Manual periodically, as Franchisor deems appropriate, to reflect additions to, deletions from, and modifications to, the specifications of those services and products that comprise a part of the LLL System.  Franchisee expressly agrees that each new or changed standard and/or specifications shall be deemed effective upon receipt.  The Manual shall delineate reasonable and mandatory specifications, standards, operating procedures, and rules prescribed periodically prescribed by Franchisor for Landscape Lighting Businesses, the products and services that Franchisor deems to comprise a part of the LLL System, and other guidelines and recommendations with respect to operational procedures.  Franchisor shall have the right to add to and otherwise modify the Manual from time to time to reflect changes in the specifications, standards, operating procedures and rules prescribed by Franchisor for Landscape Lighting Businesses, provided that no such addition or modification shall alter Franchisee's fundamental status and rights under this Franchise Agreement.

9.2     *Furnishing the Manual to Franchisee.*  Franchisor shall loan to Franchisee one (1) copy of the Manual for Franchisee's use only in connection with the Landscape Lighting Business during the term of this Agreement.  Franchisor shall have the right to provide the Manual in any format it determines is appropriate, including without limitation paper format or by making the Manual available to Franchisee in electronic form (such as through an internet website).  If Franchisor elects to provide the Manual electronically, Franchisee shall immediately return to Franchisor any and all physical copies of the Manual.

9.3     *Manual Remains Franchisor's Property*.  The Manual shall at all times remain the sole property of Franchisor and shall promptly be returned upon the expiration or other termination of this Agreement.

9.4     *Manual is Proprietary and Confidential.*  The Manual contains proprietary information of Franchisor and shall be kept confidential by Franchisee both during the term of the franchise and subsequent to the expiration and/or termination of the franchise.  Franchisee shall at all times insure that its copy of the Manual be available at the Landscape Lighting Business premises in a current and up-to-date manner.  Franchisee shall not make any unauthorized use, disclosure or duplication of any portion of the Manual.  At all times that the Manual is not in use by authorized personnel, Franchisee shall

maintain the Manual in a locked receptacle at the premises of the Landscape Lighting Business, and shall only grant authorized personnel, as defined in the Manual, access to the key or lock combination of such receptacle.  In the event of any dispute as to the contents of the Manual, the terms of the master copy of the Manual maintained by Franchisor at Franchisor's home office shall be controlling.  Access to any electronic version of the Manuals shall also be subject to Franchisor's reasonable requirements with respect to security and other matters, as described in Section 7 above.

## 10    CONFIDENTIAL INFORMATION

10.1    *Acknowledgement and Agreement with respect to Confidentiality.*  Franchisee acknowledges that its entire knowledge of the operation of a Landscape Lighting Business, including without limitation the Manual, the method of marketing, pricing, installing and servicing of related products, services, standards and Landscape Lighting Business operating procedures, customer names and addresses, is derived from information disclosed to Franchisee by Franchisor and that such information is proprietary, confidential and the trade secret of Franchisor.  Franchisee agrees that it will maintain the absolute confidentiality of all such information during and after the term of the franchise and that it will not use any such information in any other business or in any manner not specifically authorized or approved in writing by Franchisor, whether during or after the term of this Agreement.

10.2    *Limits on Disclosing Confidential Information.*  Franchisee shall divulge such confidential information only to such of its employees as must have access to it in order to operate Landscape Lighting Business.

10.3    *What is Confidential.*  Unless designated otherwise in writing by Franchisor, any and all information, knowledge and know-how, including, without limitation, drawings, materials, computer equipment, other equipment, specifications, techniques, Landscape Lighting Business systems, and other data, shall be deemed confidential for purposes of this Agreement, except information which Franchisee can demonstrate came to its attention prior to disclosure thereof by Franchisor; or which, at the time of disclosure by Franchisor to Franchisee, had become a part of the public domain, through non-wrongful publication or communication by others; or which, after disclosure to Franchisee by Franchisor, becomes a part of the public domain, through non-wrongful publication or communication by others.

10.4    *Remedies for Breach.*  Due to the special and unique nature of the confidential information, Proprietary Marks, and Manual of Franchisor, Franchisee hereby agrees and acknowledges that Franchisor shall be entitled to seek immediate equitable remedies, including but not limited to, restraining orders and injunctive relief in order to safeguard such proprietary, confidential, unique, and special information of Franchisor.  Franchisee further agrees and acknowledges that money damages alone would be an insufficient remedy with which to compensate Franchisor for any breach of the terms of Sections 9 and 10 of this Agreement, and Franchisee agrees to pay, in addition to other damages, all court costs and reasonable attorney's fees incurred by Franchisor in obtaining specific performance of, or an injunction against violation of, the requirements of Sections 9 and 10 of this Agreement.  All employees of Franchisee having access to the confidential and proprietary information agreements or other proprietary information of Franchisor shall be required to execute confidential information agreements in the form acceptable to Franchisor, including, without limitation, specific identification of Franchisor as a third party beneficiary of such covenants with the independent right to enforce them.

## 11    ACCOUNTING AND RECORDS

11.1    *Books and Records.*  Franchisee shall maintain during the term of this Agreement, and shall preserve for the time period specified in the Manual, full, complete, and accurate books, records, and accounts in accordance with the standard accounting system prescribed by Franchisor in the Manual or otherwise in writing.  Franchisee shall, retain during the term of this Agreement and thereafter, for a period of at least three (3) years from the date of their preparation, all books and records related to

the Landscape Lighting Business, including without limitation, sale checks, purchase orders, invoices, payroll records, customer lists, check stubs, sales tax records and returns, cash receipts and disbursement journals and general ledgers.

11.2 *Franchisee's Reports to Franchisor.*   In addition to the requirements of Section 4.5 above, Franchisee shall:

11.2.1    Provide to Franchisor monthly during the term of this Agreement, after the opening of the Landscape Lighting Business, a royalty report, in the form prescribed by Franchisor, accurately reflecting Total Gross Revenue during the preceding calendar month, and such other data or information as Franchisor may require.

11.2.2    Submit to Franchisor within ninety (90) days after the end of each fiscal year during the term of this Agreement, a profit and loss statement for such fiscal year and a balance sheet as of the last day of such fiscal year, prepared on an accrual basis in accordance with U.S. generally accepted accounting principles ("**GAAP**"), including but not limited to all adjustments necessary for fair presentation of the financial statements.   Franchisee shall certify such financial statements to be true and correct.   Franchisor reserves the right to require Franchisee to prepare (or cause to be prepared) and provide to Franchisor annual financial statements, prepared in accordance with GAAP, audited by an independent certified public accountant approved by Franchisor. Franchisee shall provide such additional information, if any, as Franchisor may reasonably require in order for Franchisor to meet its obligations under GAAP.

11.2.3    Franchisee shall maintain its books and records using the templates and categories that Franchisor reasonably provides to Franchisee.

11.2.4    Franchisee shall also submit to Franchisor, for review or auditing, such other forms, reports, records, sales tax receipts, information, and data as Franchisor may reasonably designate, in the forms and at the times and places reasonably required by Franchisor, upon request and as specified from time to time in the Manual or otherwise in writing (including without limitation the requirement that Franchisee provide or make available to Franchisor certain sales and financial information in electronic format and/or by electronic means).   Franchisee shall provide to Franchisor, or its designee, on Franchisor forms designated for such use by Franchisor, reports of daily receipts, vendor purchases, payroll payments, and such other forms, reports, records, and information as Franchisor may request from time to time.   Franchisee shall also report all discounts, allowances and premiums received from vendors.

11.3 *Franchisor's Right to Inspect and Audit.* Franchisor or its designated agents shall have the right at all reasonable times to examine and copy, at Franchisor's expense, the books, records, and sales and income tax returns of Franchisee.   Franchisee agrees to execute at Franchisor's request a power of attorney, I.R.S. Form 4506 or similar document, to authorize Franchisor to obtain copies of Franchisee's previous years' tax filings for the entity controlling the Landscape Lighting Business. Franchisor shall also have the right, at any time, to have an independent audit made of the books of the Landscape Lighting Business.   If an inspection should reveal that any payments have been understated in any report to Franchisor, then Franchisee shall immediately pay to Franchisor the amount understated upon demand, in addition to interest on such amount from the date such amount was due until paid, at the rate which is two percent (2%) above the Prime Rate published in the Wall Street Journal on the date payment was due, or the maximum rate permitted by law, whichever is less, calculated on a daily basis.   If an inspection discloses an understatement in any payment of three percent (3%) or more, Franchisee shall, in addition to the payments due under the immediately preceding sentence, reimburse Franchisor for any and all costs and expenses connected with the inspection (including, without limitation, travel, lodging and wage expenses and reasonable accounting and legal costs).   Franchisor has the right to terminate this Agreement upon discovery of two (2) such discrepancies in a single calendar year.   If an inspection discloses an

understatement in any payment of ten percent (10%) or more, it shall constitute grounds for immediate termination of this Agreement, as set forth in Section 14 of this Agreement. The foregoing remedies shall be in addition to any other remedies Franchisor may have.

## 12   ADVERTISING

12.1   *Standards for Advertising.*  Franchisee agrees that all of its advertising, marketing, and promotional plans shall be in such media, and of such type and format, as Franchisor may approve under Section 12.2 below; shall be conducted in a dignified manner; and, shall conform to such standards and requirements as Franchisor may specify.  Franchisee agrees not to use any advertising or promotional plans or materials unless and until Franchisee has received written approval from Franchisor, pursuant to the procedures and terms set forth in Section 12.2 below.

12.2   *Franchisor's Approval of all Proposed Advertising Plans and Materials.*  For all proposed advertising, marketing, and promotional plans, Franchisee agrees to submit samples of such plans and materials to Franchisor (by means described in Section 22 below), for Franchisor's review and prior written approval (except with respect to prices to be charged by Franchisee).  If Franchisee does not receive Franchisor's written approval within ten (10) days of the date that Franchisor received all of the sample materials, then the parties agree that Franchisor shall be deemed to have disapproved the proposed advertising, marketing, and/or promotional plans.  Franchisee acknowledges and agrees that any and all copyright in and to advertising and promotional materials developed by or on behalf of Franchisee shall be the sole property of Franchisor, and Franchisee agrees to execute such documents (and, if necessary, require its independent contractors to execute such documents) as may be deemed reasonably necessary by Franchisor to give effect to this provision.

12.3   *Advertising Materials.*  Franchisor shall make available to Franchisee from time to time, at Franchisee's expense, advertising plans and promotional materials, including newspaper mats, coupons, merchandising materials, sales aids, point-of-purchase materials, special promotions, direct mail materials, community relations programs, and similar advertising and promotional materials for use in local advertising and promotion.  In addition, Franchisor may develop advertising programs for the promotion of Proprietary Marks or merchandise offered by Landscape Lighting Business.

12.4   *Grand Opening Advertising Program.*  Franchisee agrees that it will develop and submit to Franchisor, for Franchisor's prior written approval, a grand opening marketing plan; and Franchisee also agrees that if Franchisor does not approve Franchisee's proposed plan, or if Franchisee does not submit a plan, Franchisor shall have the right (but not the obligation) to prepare a grand opening marketing plan for Franchisee (either way, the "**Opening Plan**").  Franchisee agrees to spend at least Five Thousand Dollars ($5,000) for grand opening advertising and promotional programs in conjunction with the Landscape Lighting Business' initial grand opening, in accordance with the Opening Plan (the "**Grand Opening Advertising Program**").  Franchisee shall execute and complete the Grand Opening Advertising Program within the first ninety (90) days after the signing of this Agreement, and subject to Section 12.2 above.

12.5   *Recommended Advertising Expenditure.*  Franchisee understands and acknowledges that Franchisor recommends (but does not require) that Franchisee spend five percent (5%) or more of its Total Gross Revenue for local advertising and promotion.

12.6   *Local Advertising and Promotion.*  As used in this Agreement, the term "**local advertising and promotion**" shall consist only of the direct costs of purchasing and producing advertising materials (including, but not limited to, camera-ready advertising and point of sale materials), media (space or time), and those direct out-of-pocket expenses related to costs of advertising and sales promotion spent by Franchisee in its local market or area, advertising agency fees and expenses, postage, shipping, telephone, and photocopying; however, the parties expressly agree that local advertising

and promotion shall not include costs or expenses incurred by or on behalf of Franchisee in connection with any of the following:

12.6.1    Salaries and expenses of any employees of Franchisee, including salaries or expenses for attendance at advertising meetings or activities, or incentives provided or offered to such employees, including discount coupons;

12.6.2    Charitable, political, or other contributions or donations;

12.6.3    The value of discounts provided to consumers; and

12.6.4    The cost of products.

12.7    *Yellow Page Listings.*  Franchisee agrees to maintain a business phone and advertise continuously in the classified, White, and Yellow Pages of the local telephone directory under listings deemed appropriate by Franchisor using mats of the type and size approved in advance by Franchisor. When more than one (1) Landscape Lighting Business serves a metropolitan area, classified advertisements shall list all Landscape Lighting Businesses operating in compliance with their franchise agreements (as of the date the advertisement is placed) within the reasonably anticipated distribution area of such classified directories, and Franchisee shall contribute its equal share in the cost of such advertisement.  The requirements of this Section shall be in addition to the requirements with respect to the Advertising Commitment.

12.8    *Maintain Records.*  Franchisee agrees to keep a file copy of all media advertising and to make these files available to Franchisor upon request.

## 13    **TRANSFERABILITY**

13.1    *Transfer by Franchisor.*  Franchisor shall have the right to transfer this Agreement, and/or any or all of its rights and privileges hereunder to any other person or legal entity without Franchisee's prior consent; provided that, with respect to any assignment resulting in the subsequent performance by the transferee of the functions of Franchisor, the transferee shall become solely responsible for all obligations of Franchisor under this Agreement from the date of assignment.

13.2    *No Subfranchising by Franchisee.*  Franchisee shall not offer, sell, or negotiate the sale of "Lighthouse Landscape Lighting" franchises to any third party, either in Franchisee's own name or in the name and on behalf of Franchisor, or otherwise subfranchise, share, divide or partition this Agreement, and nothing in this Agreement will be construed as granting Franchisee the right to do so.

13.3    *Principals of Franchisee.*  If Franchisee is a corporation or partnership, each principal of Franchisee ("**Principal**"), and the interest of each Principal in Franchisee, is identified in Exhibit D to this Agreement.  Any person or entity which owns a direct or indirect interest in Franchisee may be designated as a Principal by Franchisor in its sole discretion, and Exhibit D shall be so amended automatically upon notice thereof to Franchisee.  Franchisor shall have a continuing right to designate as a Principal any person or entity which owns a direct or indirect interest in Franchisee.

13.4    *No Transfers Without Franchisor's Prior Written Approval.*  Franchisee understands and acknowledges that the rights and duties set forth in this Agreement are personal to Franchisee, and that Franchisor has granted this franchise in reliance on Franchisee's or Franchisee's Principals' business skill, financial capacity, and personal character.  Accordingly:

13.4.1     Franchisee shall not, without the prior written consent of Franchisor, transfer, pledge or otherwise encumber: (a) the rights and obligations of the Franchisee under this Agreement; or (b) any material asset of Franchisee or a Landscape Lighting Business.

13.4.2     If Franchisee is a corporation, Franchisee shall not, without the prior written consent of Franchisor, issue any voting securities or securities convertible into voting securities, and the recipient of any such securities shall become a Principal under this Agreement, if so designated by Franchisor.

13.4.3     If Franchisee is a partnership, the partners of the partnership shall not, without the prior written consent of Franchisor, admit additional general partners, remove a general partner, or otherwise materially alter the powers of any general partner.  Each general partner shall automatically be deemed a Principal of Franchisee.

13.4.4     A Principal shall not, without the prior written consent of Franchisor, transfer, pledge or otherwise encumber any interest of the Principal in Franchisee as shown in Exhibit D.

13.5     *Conditions on Transfers.*  Franchisor shall not unreasonably withhold any consent required by Section 13.4 above; provided, if Franchisee proposes to transfer its obligations hereunder or any material asset, or if a Principal proposes to transfer any direct or indirect interest in Franchisee, Franchisor shall have absolute discretion to require any or all of the following as conditions of its approval:

13.5.1     The transferor shall have executed a general release, in a form satisfactory to Franchisor, of any and all claims against Franchisor and its affiliates, successors, and assigns, and their respective directors, officers, shareholders, partners, agents, representatives, servants, and employees in their corporate and individual capacities including, without limitation, claims arising under this Agreement, any other agreement between Franchisee and Franchisor or its affiliates, and federal, state, and local laws and rules;

13.5.2     The transferee of a Principal shall be designated as a Principal and each transferee who is designated a Principal shall enter into a written agreement, in a form satisfactory to Franchisor, agreeing to be bound as a Principal under the terms of this Agreement as long as such person or entity owns any interest in Franchisee; and, if the obligations of Franchisee were guaranteed by the transferor, the Principal shall guarantee the performance of all such obligations in writing in a form satisfactory to Franchisor;

13.5.3     After the transfer, the Principals of the Franchisee shall meet Franchisor's educational, managerial, and business standards; each shall possess a good moral character, business reputation, and credit rating; have the aptitude and ability to operate the Landscape Lighting Business, as may be evidenced by prior related business experience or otherwise; and have adequate financial resources and capital to operate the Landscape Lighting Business;

13.5.4     If a proposed transfer would result in a change in control of Franchisee, at Franchisor's option, Franchisee shall execute, for a term ending on the expiration date of this Agreement the form of franchise agreement then being offered to new LLL System franchisees, and such other ancillary agreements required by Franchisor for the business franchised hereunder, which agreements shall supersede this Agreement and its ancillary documents in all respects, and the terms of which may differ from the terms of this Agreement including, without limitation, a higher royalty and advertising fee;

13.5.5     If so requested by Franchisor, Franchisee, at its expense, shall upgrade the Landscape Lighting Business to conform to the then-current standards and specifications of new

Landscape Lighting Businesses then-being established in the LLL System, and shall complete the upgrading and other requirements within the time specified by Franchisor;

13.5.6   The transferor shall remain liable for all of the obligations to Franchisor in connection with the Landscape Lighting Business that arose prior to the effective date of the transfer, and any covenants that survive the termination or expiration of this Agreement, and shall execute any and all instruments reasonably requested by Franchisor to evidence such liability;

13.5.7   The transferee shall operate the Landscape Lighting Business only in accordance with the terms and conditions of this Agreement (or, if required under Section 13.5.4, a new franchise agreement);

13.5.8   At Franchisee's expense, one Principal designated by Franchisor shall successfully complete all training programs required by Franchisor upon such terms and conditions as Franchisor may reasonably require;

13.5.9   Transferee shall pay a transfer fee in an amount equal to the greater of: (a) Four Thousand Five Hundred Dollars ($4,500); and (b) ten percent (10%) of the then-current initial franchise fee.

13.5.10   The transferor must acknowledge and agree that the transferor shall remain bound by the covenants contained in Sections 16.3 and 16.4 below.

13.6   *Right of First Refusal.*

13.6.1   If Franchisee or any Principal desires to accept any bona fide offer from a third party to purchase Franchisee, any material assets of Franchisee, or any direct or indirect interest in Franchisee, Franchisee or such Principal shall promptly notify Franchisor of such offer and shall provide such information and documentation relating to the offer as Franchisor may require.  Franchisor shall have the right and option, exercisable within thirty (30) days after receipt of all such information, to send written notice to the seller that Franchisor intends to purchase the seller's interest on the same terms and conditions offered by the third party.  If Franchisor elects to purchase the seller's interest, the closing on such purchase shall occur within thirty (30) days from the date of notice to the seller of the election to purchase by Franchisor.

13.6.2   Any material change in the terms of the offer prior to closing, or lapse of more than ninety (90) days without such transfer, shall constitute a new offer subject to the same rights of first refusal by Franchisor as in the case of the third party's initial offer.  Failure of Franchisor to exercise the option afforded by this Section 13.6 shall not constitute a waiver of any other provision of this Agreement, including all of the requirements of this Section 13, with respect to a proposed transfer.

13.6.3   If the consideration, terms, and/or conditions offered by a third party are such that Franchisor may not reasonably be required to furnish the same consideration, terms, and/or conditions, then Franchisor may purchase the interest proposed to be sold for the reasonable equivalent in cash.  If the parties cannot agree within a reasonable time on the reasonable equivalent in cash of the consideration, terms, and/or conditions offered by the third party, they must attempt to appoint a mutually-acceptable independent appraiser to make a binding determination.  If the parties are unable to agree upon one independent appraiser, then an independent appraiser shall be promptly designated by Franchisor and another independent appraiser shall be promptly designated by Franchisee, which two (2) appraisers shall, in turn, promptly designate a third (3rd) appraiser; all three (3) appraisers shall promptly confer and

reach a single determination, which determination shall be binding upon Franchisor and Franchisee.  The cost of any such appraisal shall be shared equally by Franchisor and Franchisee.  If Franchisor elects to exercise its right under this Section 13.6, Franchisor shall have the right to set off all amounts due from Franchisee, and one-half (½) of the cost of the appraisal, if any, against any payment to the seller.

13.7    *Principal's Death*.  Upon the death of a Principal, the deceased's executor, administrator, or other personal representative shall transfer the deceased's interest to a third party approved by Franchisor within six (6) months after the death.  If no personal representative is designated or appointed or no probate proceedings are instituted with respect to the deceased's estate, then the distributee of such interest must be approved by Franchisor.  If the distributee is not approved by Franchisor, then the distributee shall transfer the deceased's interest to a third party approved by Franchisor within six (6) months after the deceased's death.

13.8    *Controlling Principal's Permanent Disability*.  Upon the permanent disability of any Principal with a controlling interest in Franchisee, Franchisor may, in its sole discretion, require such interest to be transferred to a third party in accordance with the conditions described in this Section 13 within six (6) months after notice to Franchisee. "Permanent Disability" shall mean any physical, emotional, or mental injury, illness, or incapacity that would prevent a person from performing the obligations set forth in this Agreement for at least six (6) consecutive months and from which condition recovery within six (6) consecutive months from the date of determination of Permanent Disability is unlikely.  Permanent Disability shall be determined by a licensed practicing physician selected by Franchisor upon examination of such person or, if such person refuses to be examined, then such person shall automatically be deemed permanently disabled for the purposes of this Section 13.8 as of the date of refusal.  Franchisor shall pay the cost of the required examination.

13.9    *Operation in the Event of Permanent Disability or Death*.  In order to prevent any interruption of the Landscape Lighting Business which would cause harm to the Landscape Lighting Business and thereby depreciate the value thereof to Franchisee, if Franchisee is absent or incapacitated by reason of Permanent Disability or death, Franchisee authorizes Franchisor to operate the Landscape Lighting Business for so long as Franchisor deems necessary and practical, and without waiver of any other rights or remedies Franchisor may have under this Agreement; provided, however, that Franchisor shall have the right not to undertake these activities and shall not be obligated to operate the franchise.  If Franchisor does so, then all monies from the operation of the business during such period of operation by Franchisor shall be kept in a separate account and the expenses of the Landscape Lighting Business, including reasonable compensation and expenses for Franchisor's representative, shall be charged to said account.  If, as provided in this Section 13.9, Franchisor temporarily operates the Landscape Lighting Business, Franchisee shall indemnify and hold harmless Franchisor and any representatives of Franchisor who may act hereunder, from any and all claims arising from the operation of the Landscape Lighting Business, including, without limitation, the acts and omissions of Franchisor and its representatives.

13.10   *No Waiver*.  Franchisor's consent to a transfer which is the subject of this Section 13 shall not constitute a waiver of any claims it may have against the transferring party, nor shall it be deemed a waiver of Franchisor's right to demand exact compliance with any of the terms of this Agreement by the transferor or transferee.

13.11   *Bankruptcy*.  If Franchisee or any person holding any interest (direct or indirect) in Franchisee becomes a debtor in a proceeding under the U.S. Bankruptcy Code or any similar law in the U.S. or elsewhere, it is the parties' understanding and agreement that any transfer of Franchisee, Franchisee's obligations and/or rights hereunder, any material assets of Franchisee, or any indirect or direct interest in Franchisee shall be subject to all of the terms of this Section 13, including without limitation the terms of Sections 13.3, 13.4, and 13.5.

13.12   *Securities Offerings.*  All materials for an offering of stock or partnership interests in Franchisee or any affiliate of Franchisee which are required by federal or state law shall be submitted to Franchisor for review as described below before such materials are filed with any government agency.  Any materials to be used in any exempt offering shall be submitted to Franchisor for such review prior to their use.  No offering by Franchisee or any affiliate of Franchisee shall imply (by use of the Proprietary Marks or otherwise) that Franchisor is participating in an underwriting, issuance, or offering of the securities of Franchisee or Franchisee's affiliates.  Franchisor shall review the offering materials, and Franchisor's review of any offering shall be limited solely to the relationship between Franchisor and Franchisee and any subsidiaries and affiliates, if applicable.  Franchisor may, at its option, require the offering materials to contain a written statement prescribed by Franchisor concerning the limitations stated in the preceding sentence.  Franchisee (and the offeror if not Franchisee), the Principals, and all other participants in the offering must fully indemnify Franchisor, its subsidiaries, affiliates, successors, and assigns, and their respective directors, officers, shareholders, partners, agents, representatives, servants, and employees in connection with the offering.  For each proposed offering, Franchisee shall pay Franchisor a non-refundable fee of Seven Thousand Five Hundred Dollars ($7,500) or such greater amount as is necessary to reimburse Franchisor for its reasonable costs and expenses (including legal and accounting fees) for reviewing the proposed offering.  Franchisee shall give Franchisor written notice at least thirty (30) days before the date that any offering or other transaction described in this Section 13.11 commences.  Any such offering shall be subject to all of the other provisions of this Section 13, including without limitation the terms set forth in Sections 13.3, 13.4, and 13.5; and further, without limiting the foregoing, it is agreed that any such offering shall be subject to Franchisor's approval as to the structure and voting control of the offeror (and Franchisee, if Franchisee is not the offeror) after the financing is completed.

13.13   *Changes Merely for the Convenience of Ownership.*  If Franchisee proposes to reincorporate its business or change the Entity in which the rights under this Agreement and the assets of the Landscape Lighting Business are owned, solely for the convenience of the Principals and not for any other purpose, and there is to be no change in the composition of the Principals or any other aspects of the owner of Franchisee, then in connection with such a proposed transfer: (a) Franchisor shall not withhold its approval; and (b) Franchisee shall not be required to comply with the provisions of Sections 13.4.4, 13.4.8, 13.4.9, and 13.5 above.

## 14   <u>TERMINATION</u>

14.1   *Termination Without Opportunity to Cure.*  Franchisee shall be deemed to be in default and Franchisor shall have the right  to terminate this Agreement and all rights granted hereunder, without affording Franchisee any opportunity to cure the default, effective immediately upon the delivery of written notice to Franchisee by Franchisor, upon the occurrence of any of the following events:

14.1.1   Any attempt by Franchisee or any Principal to sell, assign, transfer or encumber in whole or in part any or all rights and obligations under this Agreement, in violation of the terms of this Agreement, or without the written consents required pursuant to this Agreement;

14.1.2   Franchisee's failure to meet the Minimum Development Obligation within the Development Period;

14.1.3   Franchisee failure to meet the Minimum Revenue Requirements as specified in Section 2.2 above;

14.1.4   If Franchisee at any time ceases to operate for thirty (30) days or more consecutive business days, or otherwise abandons the Landscape Lighting Business, or otherwise

forfeits the right to do or transact business in the jurisdiction where the Landscape Lighting Business is located;

14.1.5   If Franchisee or any Principal is convicted of a felony, fraud, a crime involving moral turpitude, or any other crime, offense, or activity that Franchisor believes is reasonably likely to have an adverse effect on the LLL System, the Proprietary Marks, the goodwill associated therewith, or Franchisor's interest therein;

14.1.6   If a threat or danger to public health or safety results from the maintenance or operation of the Landscape Lighting Business which is not immediately corrected by Franchisee;

14.1.7   If Franchisee and/or Franchisee's designated individual fails to attend and complete, to Franchisor's satisfaction, the initial training program required by Franchisor, as described in Section 6 of this Agreement;

14.1.8   If Franchisee fails to comply with the covenants set forth in Section 16 below, or fails to obtain execution of the covenants required under Section 16.9 below;

14.1.9   If, contrary to the terms of Sections 8 or 9 of this Agreement, Franchisee discloses or divulges the contents of the Manual or other confidential information provided to Franchisee by Franchisor;

14.1.10   If an approved transfer is not effected within a reasonable time, as required by Section 13 below;

14.1.11   If Franchisee knowingly maintains false books or records, or submits any false reports to Franchisor; or any inspection of Franchisee's records discloses an understatement of payments due Franchisor of ten percent (10%) or more;

14.1.12   If Franchisee, after curing a default pursuant to Section 14.3 below, commits the same act of default again within a twelve (12) month period;

14.1.13   If Franchisee incurs a Late Fee under Section 4.5 above three (3) or more times within a twelve (12) month period; or

14.1.14   If Franchisee repeatedly fails to pay on a timely basis its taxes or other governmental charges, or payments to suppliers, contractors, or trade creditors.

14.1.15   Any breach with respect to Anti-Terrorism Laws as set forth in Section 24.5 below.

14.2   *Automatic Termination.*   Franchisee shall be deemed to be in default under this Agreement, and all rights granted in this Agreement shall automatically terminate without notice to Franchisee, if Franchisee shall become insolvent or makes a general assignment for the benefit of creditors; or if a petition in bankruptcy is filed by Franchisee or against Franchisee and not opposed to by Franchisee; or if Franchisee is adjudicated as bankrupt or insolvent; or if a bill in equity or other proceeding for the appointment of a receiver of Franchisee or other custodian for Franchisee's business or assets is filed and consented to by Franchisee; or if a receiver or other custodian (permanent or temporary) of Franchisee's assets or property, or any part thereof, is appointed by any court of competent jurisdiction; or if proceedings for a composition with creditors under any state or federal law should be instituted by or against Franchisee; or if a final judgment remains unsatisfied of of record for thirty (30) days or longer (unless supersedeas bond is filed); or if Franchisee is dissolved; or if execution is levied against Franchisee's business or property; or if the real or personal property of Franchisee's Landscape Lighting Business shall be sold after levy thereupon by any sheriff, marshal, or constable.

14.3    *Termination After Notice.*  Except as otherwise provided in Sections 14.1 and 14.2 above, upon any other default under this Agreement by Franchisee, Franchisor may terminate this Agreement only by giving written notice of termination stating the nature of such default to Franchisee at least thirty (30) days before the effective date of termination; provided, however, that Franchisee may avoid termination by immediately initiating a remedy to cure such default, curing it to Franchisor's satisfaction, and by promptly providing proof thereof to Franchisor within the thirty-day period (if the default is of such a nature that it cannot reasonably be cured within thirty days, and if Franchisee has initiated and is diligently pursuing a cure, and has given written notice thereof to Franchisor within the original thirty-day period, then Franchisee shall be entitled to an additional thirty days within which to complete the cure).  If any such default is not cured within the specified time, or such longer period as applicable law may require, this Agreement shall terminate without further notice to Franchisee effective immediately upon the expiration of the thirty (30) day period or such longer period as applicable law may require.  The parties agree that a default "of such a nature that it cannot reasonably be cured within thirty days" does not include failure to pay monies when due and in the amount due.  Among other things, Franchisee shall be in default hereunder for any failure to comply with any of the requirements imposed by this Agreement or any other Agreement between Franchisor (or an affiliate of Franchisor) and Franchisee (or an affiliate of Franchisee), as it may from time to time reasonably be supplemented, or to carry out the terms of this Agreement in good faith.

## 15    OBLIGATIONS UPON TERMINATION OR EXPIRATION

Upon termination or expiration, this Agreement and all rights granted hereunder to Franchisee shall terminate immediately, and:

15.1    *Cease Operation.*   Franchisee shall immediately cease to operate the Landscape Lighting Business under this Agreement, and shall not thereafter, directly or indirectly, represent to the public or hold itself out as a present or former franchisee of Franchisor.

15.2    *Stop Using the Proprietary Marks.*   Upon the termination of this Agreement, for any reason, Franchisee's right, license and privilege to use the Proprietary Marks shall immediately and forever terminate.  Franchisee shall immediately and permanently cease to use, by advertising or in any manner whatsoever, any confidential methods, procedures and techniques associated with the LLL System; the Proprietary Marks; and all other Proprietary Marks and distinctive forms, slogans, signs, symbols, and devices associated with the LLL System.  In particular, Franchisee shall cease to use, without limitation, all signs, advertising materials, displays, stationery, forms, and any other articles which display the Proprietary Marks; provided, however, that this Section 15.2 shall not apply to the operation by Franchisee of any other franchise under the LLL System which may be granted by Franchisor to Franchisee pursuant to a separate agreement relating to such franchise.

15.3    *Cancel Assumed Name.*   Franchisee shall take such action as may be necessary to cancel or assign to Franchisor or Franchisor's designee, at Franchisor's option, any assumed name or equivalent registration filed with state, city, or county authorities which contains the mark "Lighthouse Landscape Lighting" or any other Proprietary Marks, and Franchisee shall furnish Franchisor with confirmation that this obligation has been fulfilled within thirty (30) days after termination or expiration of this Agreement.

15.4    *No Use of the Proprietary Marks in Other Businesses.*   Franchisee agrees, in the event it continues to operate or subsequently begins to operate any other business, not to use any reproduction, counterfeit, copy, or colorable imitation of the Proprietary Marks, either in connection with such other business or the promotion thereof, which is likely to cause confusion, mistake, or deception, or which is likely to dilute Franchisor's rights in and to the Proprietary Marks, and further agrees not to utilize any designation of origin or description or representation which falsely suggests or represents a past, present, or other association or connection with

Franchisor, the Proprietary Marks, the LLL System, the products or services sold under the Proprietary Marks, or otherwise.

15.5    *Pay Franchise All Amounts Due.*  Franchisee shall promptly pay all sums owing to Franchisor and its affiliates, including without limitation sums due for Royalty Fees, amounts due for purchases made from Franchisor or its affiliates, and all other amounts to Franchisor or its affiliates.  In the event of termination for any default of Franchisee, such sums shall include all damages, costs, and expenses (including without limitation reasonable attorney's fees) incurred by Franchisor as a result of the default, which obligation shall give rise to and remain, until paid in full, a lien in favor of Franchisor against any and all of the personal property, furnishings, equipment, signs, fixtures, and inventory owned by Franchisee at the time of default.  In addition, all debts, including bank loans, must be subordinate to any debts owed by Franchisee to Franchisor.

15.6    *Pay Franchisor Damages.*  Franchisee shall pay to Franchisor all damages, costs, and expenses (including without limitation reasonable attorney's fees) that Franchisor incurs in: (a) obtaining injunctive or other relief for the enforcement of any provisions of this Agreement (including without limitation this Section 15 and/or Section 14 above); and/or (b) successfully defending a claim that Franchisor defrauded Franchisee into signing this Agreement, that the provisions of this Agreement are not fair, were not properly entered into, and/or that the terms of this Agreement do not govern the parties' relationship.

15.7    *Return Materials to Franchisor.*  Franchisee shall immediately deliver to Franchisor (and Franchisee shall not retain or provide any other party with a copy of) all written materials and manuals, including without limitation the Manual, records, customer lists, files, instructions, brochures, agreements, disclosure documents, correspondence, and any and all other materials provided by Franchisor to Franchisee relating to the operation of the Landscape Lighting Business, except Franchisee's copy of this Agreement and of any correspondence between the parties and any other documents which Franchisee reasonably needs for compliance with any applicable law.

15.8    *Return Signage.*  Franchisor shall have the right, title and interest to any sign or sign faces bearing the Proprietary Marks.  Franchisee hereby acknowledges Franchisor's right to access the premises of the Landscape Lighting Business should Franchisor elect to take possession of any said sign or sign faces bearing the Proprietary Marks.

15.9    *Telephone Numbers.*  Franchisee hereby acknowledges that all telephone numbers, e-mail addresses, domain names (if and as permitted), and other means of communication used in connection with operation of the Landscape Lighting Business (collectively, the "**Contact Numbers**") constitute assets of the Landscape Lighting Business; and upon termination or expiration of this Agreement, Franchisee shall assign to Franchisor or its designee, all Franchisee's right, title, and interest in and to the Contact Numbers and shall notify the telephone company, all listing agencies, and any other party with which a Contact Number is registered of the termination or expiration of Franchisee's right to use any Contact Number, and shall authorize a transfer of the Contact Numbers to, or upon written direction of, Franchisor.

15.10    *Purchase Of Certain Assets.*  Within fifteen (15) days from the date of termination, Franchisee and Franchisor shall arrange for an inventory to be made, at Franchisor's cost, of all of the assets of the Landscape Lighting Business, including without limitation resaleable merchandise, materials, supplies, inventory, equipment, signs, advertising materials, and other items related to the operation of the Landscape Lighting Business, and/or bearing the Proprietary Marks (the "**Business Assets**").  Franchisor shall have the option, to be exercised in writing within thirty (30) days after termination or expiration, to purchase from Franchisee any or all such Business Assets at a purchase price which shall be the book value of the assets, adjusted, if necessary, to reflect straight line depreciation over the reasonable useful lives of, and reasonable salvage values for, inventory, equipment, and signs of the Landscape Lighting Business.  Book value shall be determined from the most recent financial statements of the Landscape Lighting Business;

however, if in Franchisor's judgment, such information is out of date or unreliable, Franchisor may conduct an audit and/or a merchandise inventory to determine book value.  If Franchisor elects to exercise any option to purchase herein provided, it shall have the right to set off all amounts due from Franchisee under this Agreement, including interest and penalties thereon, against any payment therefor.  The purchase price shall be paid in cash at the closing of the purchase, which shall take place no later than ninety (90) days after receipt by Franchisee of Franchisor's notice of exercise of this option to purchase the assets, at which time Franchisee shall deliver instruments transferring to Franchisor or its nominee:  (1) good and merchantable title to the assets purchased, free and clear of all liens and encumbrances (other than liens and security interests acceptable to Franchisor), with all sales and other transfer taxes paid by Franchisee; and (2) all licenses and permits which may be assigned or transferred.  In the event that Franchisee cannot deliver clear title to all of the purchased assets as aforesaid, or in the event there shall be other unresolved issues, the closing of the sale shall be accomplished through an escrow arrangement.  Further, Franchisee and Franchisor shall, prior to closing, comply with the applicable Bulk Sales provisions of the Uniform Commercial Code as enacted in the state where the Landscape Lighting Business is located.  If Franchisor exercises this option to purchase the assets, pending the closing of such purchase above, Franchisor shall have the right to appoint a manager to maintain the operation of the Landscape Lighting Business, in accordance with the relevant provisions of Section 13.  Alternatively, Franchisor may require Franchisee to close the Landscape Lighting Business during such time period without removing therefrom any assets.  Franchisee shall maintain in force all insurance policies required by Section 19 hereof until the date of closing.

15.11   *Comply with Covenants.*  Franchisee shall comply with the covenants contained in Section 16 of this Agreement.

# 16   <u>COVENANTS</u>

16.1   *Coverage.*  Unless otherwise specified, the term "Franchisee" as used in this Section 17 shall include, collectively and individually, all officers, directors, and holders of a beneficial interest of five percent (5%) or more of the securities of Franchisee, and of any corporation directly or indirectly controlling Franchisee, if Franchisee is a corporation; and the general partners and any limited partner (including any corporation and the officers, directors, and holders of a beneficial interest of five percent (5%) or more of securities, of a corporation which controls, directly or indirectly, any general or limited partner), if Franchisee is a partnership.

16.2   *Full Time, Energy, and Best Efforts.*  Franchisee covenants that during the term of this Agreement, except as otherwise approved in writing by Franchisor, Franchisee (if Franchisee is an individual), a shareholder of a beneficial interest of ten percent (10%) or more of the securities of Franchisee (if Franchisee is a corporation), a general partner of Franchisee (if Franchisee is a partnership), or Franchisee's approved manager shall devote full time, energy, and best efforts, to the management and operation of the Landscape Lighting Business.  Notwithstanding the above, the Franchisor agrees that Franchisee may operate other non-competing businesses outside of the Landscape Lighting Business so long as it does not adversely impact the sales of the Landscape Lighting Business and it is not operated within the same corporation.

16.3   *During the Agreement Term.*  Franchisee specifically acknowledges that, pursuant to this Agreement, Franchisee will receive valuable specialized training and confidential information, including, without limitation, information regarding the operational, sales, promotional and marketing methods and techniques of Franchisor and the LLL System.  Franchisee covenants that, during the term of this Agreement, except as otherwise approved in writing by Franchisor, Franchisee shall not, either directly or indirectly, for itself, or through, on behalf of, or in conjunction with, any person, persons, or legal entity:

   16.3.1   Divert or attempt to divert any business or customer of the Landscape Lighting Business to any competitor, by direct or indirect inducement or otherwise, or do or perform, directly

or indirectly, any other act injurious or prejudicial to the goodwill associated with Franchisor's Proprietary Marks and the LLL System.

16.3.2    Employ or seek to employ any person who is at that time employed by Franchisor or by any other franchisee or affiliate of Franchisor, or otherwise directly or indirectly induce such person to leave his or her employment.

16.3.3    Own, maintain, engage in, consult with, or have any interest in any business (including any business operated by Franchisee prior to entry into this Agreement) specializing in whole or in part, in selling, offering or providing through any channel of distribution whatsoever including but not limited to merchandise, products, and services that are the same as or similar to that provided or sold through the LLL System

16.4    *During or After the Agreement; and After a Transfer*.   Franchisee covenants that, except as otherwise approved in writing by Franchisor, Franchisee shall not, during the term of this Agreement and for a continuous uninterrupted period commencing upon:

(a)    a transfer permitted under Section 13 above;

(b)    expiration or termination of this Agreement (regardless of the cause for termination); or

(c)    a final order of a duly authorized arbitrator, panel of arbitrators, or a court of competent jurisdiction (after all appears have been exhausted);

and continuing for two (2) years thereafter, either directly or indirectly for itself, or through, on behalf of, or in conjunction with, any person, persons, or legal entity, own, maintain, operate, engage in, be employed by, or have any interest in any business which provides outdoor lighting services or products which is, or is intended to be, located within ten (10) miles of the Protected Territory of the Landscape Lighting Business, or within ten (10) miles of any other Lighthouse Landscape Lighting Businesses in existence or planned as of the time of termination or expiration of this Agreement.

16.5    *Public Entities*.   Sections 16.3 and 16.4 above shall not apply to ownership by Franchisee of less than a five percent (5%) beneficial interest in the outstanding equity securities of any publicly-held corporation.

16.6    *Agreement to be Abide by Less Restrictive Provisions*.

16.6.1    The parties agree that each of the covenants in this Section 16 shall be interpreted and understood to be independent of any other covenant or provision of this Agreement.  If a court or agency that has proper jurisdiction (in an unappealed final decision to which Franchisor is a party) determines that the entire covenant or any part of a covenant in this Section 16 is unreasonable or unenforceable, then Franchisee expressly agrees to be bound instead by any less restrictive covenant that is included within the terms of the maximum covenant, just as if the resulting covenant were separately spelled out and made a part of this Section 16.

16.6.2    Franchisee understands and acknowledges that Franchisor shall have the right, in its sole discretion, to reduce the scope of any covenant set forth in this Section 16, or any portion thereof, without Franchisee's consent, effective immediately upon receipt by Franchisee of written notice thereof; and Franchisee agrees that it shall comply forthwith with any covenant as so modified, which shall be fully enforceable notwithstanding the provisions of Section 21.7 below.

16.7    *No Claims Constitute a Defense*.   Franchisee expressly agrees that the existence of any claims it may have against Franchisor, whether or not arising from this Agreement, shall not constitute a

defense to the enforcement by Franchisor of the covenants in this Section 16.  Franchisee agrees to pay all costs and expenses (including without limitation reasonable attorney's fees) incurred by Franchisor in connection with the enforcement of this Section 16.

16.8    *Injury Resulting from Violations.*  Franchisee acknowledges that Franchisee's violation of the terms of this Section 16 would result in irreparable injury to Franchisor for which no adequate remedy at law may be available, and Franchisee accordingly consents to the issuance of an injunction prohibiting any conduct by Franchisee in violation of the terms of this Section 16.

16.9    *Personal Covenants.*   At Franchisor's request, Franchisee shall require and obtain execution of covenants similar to those set forth in this Section 16 (including covenants applicable upon the termination of a person's relationship with Franchisee) from any or all of the following persons:  (a) All principals of Franchisee (if Franchisee is a corporation, partnership or limited liability company), all managers of Franchisee, and any other personnel employed by Franchisee who have received or will receive training in the LLL System; (b) all officers, directors, and holders of a beneficial interest of five percent (5%) or more of the securities of Franchisee, and of any corporation directly or indirectly controlling Franchisee, if Franchisee is a corporation; and (c) the general partners, any limited partners or members (including any corporation, and the officers, directors, and holders of a beneficial interest of five percent (5%) or more of the securities of any corporation which controls, directly or indirectly, any general or limited partner or members), if Franchisee is a partnership or limited liability company.  Every covenant required by this Section 16.9 shall be in a form satisfactory to Franchisor, including, without limitation, specific identification of Franchisor as a third party beneficiary of such covenants with the independent right to enforce them.  Failure by Franchisee to obtain execution of a covenant required by this Section 16.9 shall constitute a default under Section 14.1.7 hereof.

## 17    <u>APPLICABLE LAW AND DISPUTE RESOLUTION</u>

17.1    *Governing Law.*  This Agreement shall be interpreted and construed exclusively under the laws of the State of Florida, which laws shall prevail in the event of any conflict of law (without regard to, and without giving effect to, the application of Florida choice-of-law rules); provided, however, that if the covenants in Section 16 of this Agreement would not be enforceable under the laws of Florida, and the Landscape Lighting Business(es) are located outside of Florida, then such covenants shall be interpreted and construed under the laws of the state in which the Landscape Lighting Business(es) are located.   Nothing in this Section 17.1 is intended by the parties to subject this Agreement to any franchise or similar law, rule, or regulation of the State of Florida to which the parties would not otherwise be subject.

17.2    *Arbitration.*   Any controversy or claim arising out of or relating to this Agreement, or any breach thereof, including, without limitation, any claim that said Agreement, or any part thereof, is invalid, illegal or otherwise voidable or void, or the enforcement of any right or obligation which by its nature survives the expiration or termination hereof, shall be submitted to arbitration before and in accordance with the Commercial Arbitration Rules of the Arbitration of the American Arbitration Association and judgment upon the award may be entered in any court having jurisdiction thereof; provided, however, that this clause shall not be construed to limit Franchisor from bringing any action in any court of competent jurisdiction for injunctive or other provisional relief as Franchisor deems to be necessary or appropriate to protect its trademarks, trade names, service marks, logotypes, insignia, trade dress and designs, or to enjoin or restrain Franchisee from otherwise causing immediate and irreparable harm to Franchisor.  Such arbitration shall take place in an AAA office within or nearest to Franchisor's then-current corporate headquarters (currently, St. Augustine, Florida).  This arbitration provision shall be deemed to be self-executing, and in the event that either party fails to appear at any properly noticed arbitration proceeding, an award may be entered against such party notwithstanding failure to appear.

17.3    *Non-Binding Mediation.*   Before any party may bring an action in court against the other, or commence an arbitration proceeding (except as otherwise provided in Section 17.5 below), the

parties must first meet to mediate the dispute.  Any such mediation shall be non-binding and shall be conducted by the American Arbitration Association in accordance with its then-current rules for mediation of commercial disputes.

17.4    *No Rights Exclusive of Other Rights.*   No right or remedy conferred upon or reserved to Franchisor or Franchisee by this Agreement is intended to be, nor shall be deemed, exclusive of any other right or remedy in this Agreement or by law or equity provided or permitted, but each shall be cumulative of every other right or remedy.

17.5    *Injunctive Relief.*   Nothing in this Agreement contained shall bar Franchisor's right to obtain injunctive relief against threatened conduct that will cause it loss or damages, under the usual equity rules, including the applicable rules for obtaining restraining orders and preliminary injunctions.

**17.6    *WAIVER OF JURY TRIAL.*  FRANCHISOR AND FRANCHISEE IRREVOCABLY WAIVE TRIAL BY JURY IN ANY ACTION, PROCEEDING, OR COUNTERCLAIM, WHETHER AT LAW OR IN EQUITY, BROUGHT BY EITHER OF THEM AGAINST THE OTHER, WHETHER OR NOT THERE ARE OTHER PARTIES IN SUCH ACTION OR PROCEEDING.**

**17.7    *WAIVER OF PUNITIVE DAMAGES.*  FRANCHISOR AND FRANCHISEE HEREBY WAIVE TO THE FULLEST EXTENT PERMITTED BY LAW ANY RIGHT TO OR CLAIM OF ANY PUNITIVE OR EXEMPLARY DAMAGES AGAINST THE OTHER, AND AGREE THAT IN THE EVENT OF A DISPUTE BETWEEN THEM EACH SHALL BE LIMITED TO THE RECOVERY OF ANY ACTUAL DAMAGES THAT IT HAS SUSTAINED.**

**17.8    *CLAIMS MUST BE BROUGHT WITHIN ONE YEAR.*  ANY AND ALL CLAIMS AND ACTIONS ARISING OUT OF OR RELATING TO THIS AGREEMENT, THE RELATIONSHIP OF FRANCHISEE AND FRANCHISOR, OR FRANCHISEE'S OPERATION OF THE LANDSCAPE LIGHTING BUSINESS, BROUGHT BY ANY PARTY HERETO AGAINST THE OTHER, SHALL BE COMMENCED WITHIN ONE (1) YEAR FROM THE OCCURRENCE OF THE FACTS GIVING RISE TO SUCH CLAIM OR ACTION, OR, IT IS EXPRESSLY ACKNOWLEDGED AND AGREED BY ALL PARTIES, SUCH CLAIM OR ACTION SHALL BE IRREVOCABLY BARRED.**

**17.9    *NO CLASS OR CONSOLIDATED ACTIONS.*  ANY LITIGATION BETWEEN THE PARTIES SHALL BE CONDUCTED ON AN INDIVIDUAL BASIS, AND NOT AS PART OF A CONSOLIDATED, COMMON, OR CLASS ACTION.**

## 18    INDEPENDENT CONTRACTOR

18.1    *No Fiduciary Relationship.*   It is understood and agreed by the parties hereto that this Agreement does not create a fiduciary relationship between them; that Franchisee shall be an independent contractor; and that nothing in this Agreement is intended to constitute either party as an agent, legal representative, subsidiary, joint venturer, partner, employee, or servant of the other for any purpose whatsoever.

18.2    *Public Notice.*  During the term of this Agreement and any extensions hereof, Franchisee shall hold itself out to the public as an independent contractor operating the business pursuant to a franchise from Franchisor.  Franchisee agrees to take such action as may be necessary to do so, including, without limitation, prominently display a notice of that fact in a conspicuous place in the franchised premises, the content and form of which Franchisor reserves the right to specify.

18.3    *No Authority to Bind Franchisor.*   It is understood and agreed that nothing in this Agreement authorizes Franchisee to make any contract, agreement, warranty, or representation on Franchisor's behalf, or to incur any debt or other obligation in Franchisor's name; and that Franchisor shall in no event assume liability for, or be deemed liable hereunder as a result of, any such action; nor shall

Franchisor be liable by reason of any act or omission of Franchisee in its conduct of the Landscape Lighting Business or for any claim or judgment arising therefrom against Franchisee or Franchisor.

18.4    *Relationship of Franchisee to Franchisor.*   It is expressly agreed that the parties intend by this Agreement to establish between Franchisor and Franchisee the relationship of franchisor and franchisee.   It is further agreed that Franchisee has no authority to create or assume in Franchisor's name or on behalf of Franchisor, any obligation, express or implied, or to act or purport to act as agent or representative on behalf of Franchisor for any purpose whatsoever.   Neither Franchisor nor Franchisee is the employer, employee, agent, partner or co-venturer of or with the other, each being independent.  Franchisee agrees that he will not hold himself out as the agent, employee, partner or co-venturer of Franchisor.  All employees hired by or working for Franchisee shall be the employees of Franchisee and shall not, for any purpose, be deemed employees of Franchisor or subject to Franchisor control.  Each of the parties agrees to file its own tax, regulatory and payroll reports with respect to its respective employees and operations, saving and indemnifying the other party hereto of and from any liability of any nature whatsoever by virtue thereof.

## 19    **INSURANCE**

19.1    *Insurance.*   Franchisee shall procure, prior to the commencement of any operations under this Agreement, and shall maintain in full force and effect at all times during the Term of this Agreement, at Franchisee's expense, an insurance policy or policies insuring Franchisee and Franchisor, and their respective officers, directors, shareholders, partners, members, and employees, against any demand or claim with respect to personal injury, death, or property damage, or any loss, liability, or expense whatsoever arising or occurring upon or in connection with the Landscape Lighting Business, as Franchisor may reasonably require for their own and Franchisee's protection. Franchisor and such of its respective affiliates shall be named additional insured in such policy or policies.

19.2    *Coverage.*   Such policy or policies shall be written by an insurance company rated A or better by Best Insurance Ratings Service and satisfactory to Franchisor in accordance with standards and specifications set forth in the Manual or otherwise in writing, and shall include, at a minimum (except as additional coverages and higher policy limits may reasonably be specified by Franchisor from time to time in the Manual or otherwise in writing), the following initial minimum coverage:

19.2.1    Worker's Compensation Insurance in amounts prescribed by law;

19.2.2    Comprehensive General Liability Insurance and product liability insurance, to include bodily injury and property damage:

a.    For each occurrence -- Not less than $1,000,000

b.    General aggregate -- Not less than $2,000,000; and

19.2.3    Fire and lighting, extended coverage, theft, vandalism and malicious mischief, flood and sprinkler leakage insurance on all fixtures, equipment, supplies and other property used in the Landscape Lighting Business, and on the Landscape Lighting Business for at least 80% of the cash value of all of the above; provided, however, appropriate deductible clause as approved by Franchisor shall be permitted.

19.2.4    Automobile liability insurance, and property damages liability, including owned, hired and non-owned vehicle coverage, with a combined single limit of at least $1,000,000.

19.2.5    Business interruption insurance for actual losses sustained.

19.2.6    Such insurance and such types (and amounts) of coverage as may be required by the terms of any lease for the Landscape Lighting Business or as Franchisor may periodically specify by written notice to Franchisee.

19.3    *Not Affected by Franchisor's Coverage or Indemnity Provision.*  Franchisee's obligation to obtain and maintain the foregoing policy or policies in the amounts specified shall not be limited in any way by reason of any insurance which may be maintained by Franchisor, nor shall Franchisee's performance of that obligation relieve it of liability under the indemnity provisions set forth in Section 20 of this Agreement.

19.4    *Certificates of Insurance.*  At least thirty (30) days prior to the time any insurance is first required to be carried by Franchisee, and thereafter at least thirty (30) days prior to the expiration of any such policy, Franchisee shall deliver to Franchisor certificates of insurance evidencing the proper coverage with limits not less than those required hereunder.  All certificates shall expressly provide that not less than thirty (30) days' prior written notice shall be given Franchisor in the event of material alteration to, or cancellation of, the coverages evidenced by such certificates.

19.5    *Franchisor's Right to Obtain Insurance for Franchisee.*  Should Franchisee, for any reason, fail to procure or maintain the insurance required by this Agreement, as such requirements may be revised from time to time by Franchisor in the Manual or otherwise in writing, Franchisor shall have the right and authority (without, however, any obligation to do so) immediately to procure such insurance and to charge same to Franchisee, which charges, together with a reasonable fee for Franchisor's expenses in so acting, shall be payable by Franchisee immediately upon notice.  The foregoing remedies shall be in addition to any other remedies Franchisor may have.

## 20    **INDEMNIFICATION**

20.1    *Losses and Expenses.*  As used in this Section, the phrase "**losses and expenses**" shall include, without limitation, all losses, compensatory, exemplary, consequential, incidental, or punitive damages, fines, charges, costs, lost profits, attorneys' fees, accountants' fees, expert witness fees, expenses, court costs, settlement amounts, judgments, compensation for damages to Franchisor's reputation and goodwill, costs of or resulting from delays, financing, costs of advertising material and media time/space, and costs of changing, substituting or replacing the same, and any and all expenses of recall, refunds, compensation, public notices and other such amounts incurred in connection with the matters described.

20.2    *Obligation to Indemnify.*  Franchisee shall, at all times, indemnify and hold harmless to the fullest extent permitted by law Franchisor, its corporate affiliates, successors and assigns and the respective directors, officers, employees, agents and representatives of each (collectively, the "**Indemnitees**") from all losses and expenses incurred in connection with any action, suit, proceeding, claim, demand, investigation or inquiry (formal or informal), or any settlement thereof (whether or not a formal proceeding or action has been instituted) which arises out of or is based upon any of the following:

20.2.1    Franchisee's violation, breach or asserted violation or breach of any contract, federal state or local law (including any franchise law or business opportunity law), regulation, rule, order, standard, or directive or of any industry standard;

20.2.2    Libel, slander or any other form of defamation by Franchisee;

20.2.3    Franchisee's violation or breach of any warranty, representation, agreement or obligation in this Agreement;

20.2.4    Acts, errors or omissions of Franchisee or any of its agents, servants, employees, contractors, partners, affiliates or representatives.

20.3     *Notice*.  Franchisee shall promptly notify Franchisor of any action, suit, proceeding, claim, demand, inquiry or investigation as described in Section 20.2.  If Franchisor is or may be named as a party in any such action, Franchisor may elect (but under no circumstances will be obligated) to undertake the defense and/or settlement thereof.  No such undertaking by Franchisor shall, in any manner or form, diminish Franchisee's obligation to indemnify Franchisor and to hold it harmless.

20.4     *Actions by Franchisor*.  With respect to any action, suit, proceeding, claim, demand, inquiry or investigation, Franchisor may, at any time and without notice, in order to protect persons or property or the reputation or goodwill of Franchisor or others, order, consent or agree to any settlement or take any remedial or corrective action as Franchisor deems expedient, if, in Franchisor's sole judgment, there are reasonable grounds to believe that:

20.4.1     any of the acts or circumstances enumerated in Section 20.2 have occurred; or

20.4.2     any act, error, or omission of Franchisee may result directly in or indirectly in damage, injury, or harm to any person or any property.

20.5     *Obligation Not Affected by the Subsequent Outcome*.  All losses and expenses incurred under this Section 20 shall be chargeable to and paid by Franchisee pursuant to its obligations of indemnity hereunder, regardless of any actions, activity, or defense undertaken by Franchisor or the subsequent success or failure of such actions, activity or defense.

20.6     *Third Party Recovery Not Required*.  Under no circumstances shall the Indemnitees be required or obligated to seek recovery from third parties in order to maintain a claim against Franchisee. Franchisee agrees that the failure to pursue such recovery or mitigate loss will in no way reduce the amounts recoverable by the Indemnitees from Franchisee.

20.7     *No Liability for Indemnitees*.  The Indemnitees assume no liability whatsoever for any acts, errors, or omissions of any persons with whom Franchisee may contract, regardless of the purpose. Franchisee shall hold harmless and indemnify the Indemnitees and each of them for all losses and expenses that may arise out of any acts, errors or omissions of such third parties with whom Franchisee may contract.

21     **GENERAL PROVISIONS**

21.1     *Non-Waiver*.  No failure of Franchisor to exercise any power reserved to it hereunder, or to insist upon strict compliance by Franchisee with any obligation or condition hereunder or in any other agreement between Franchisor or Franchisee (whether entered into before, after or contemporaneously with the execution of this Agreement, and whether or not related to the Landscape Lighting Business), and no custom or practice of the parties in variance with the terms hereof, shall constitute a waiver of Franchisor's right to demand exact compliance with the terms hereof.  Waiver by Franchisor of any particular default by Franchisee shall not be binding unless in writing and executed by the party sought to be charged and shall not affect or impair Franchisor's right with respect to any subsequent default of the same or of a different nature; nor shall any delay, waiver, forbearance, or omission of Franchisor to exercise any power or rights arising out of any breach or default by Franchisee of any of the terms, provisions, or covenants hereof, affect or impair Franchisor's rights nor shall such constitute a waiver by Franchisor of any right hereunder or of the right to declare any subsequent breach or default.  Subsequent acceptance by Franchisor of any payment(s) due to it hereunder shall not be deemed to be a waiver by Franchisor of any preceding breach by Franchisee of any terms, covenants or conditions of this Agreement.

21.2     *Survival of Covenants*.  The covenants contained in this Agreement which, by their terms, require performance by the parties after the expiration or termination of this Agreement, shall be

enforceable notwithstanding said expiration or other termination of this Agreement for any reason whatsoever.

21.3    *Successors and Assigns.*  This Agreement shall be binding upon and inure to the benefit of the successors and assigns of Franchisor and shall be binding upon and inure to the benefit of Franchisee and his or their respective heirs, executors, administrators, successors and assigns, subject to the prohibitions against assignment contained in this Agreement

21.4    *Joint and Several Liability.*  If Franchisee consists of more than one person or entity, or a combination thereof, the obligations and liabilities of each such person or entity to Franchisor are joint and several.

21.5    *Counterparts.*  This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original and all of which together shall be deemed to be one and the same instrument.

21.6    *Submission of Agreement.*  The submission of this Agreement does not constitute an offer and this Agreement shall become effective only upon the execution thereof by Franchisor and Franchisee. THIS AGREEMENT SHALL NOT BE BINDING ON COMPANY UNLESS AND UNTIL IT SHALL HAVE BEEN ACCEPTED AND SIGNED BY THE PRESIDENT OF COMPANY. THIS AGREEMENT SHALL NOT BECOME EFFECTIVE UNTIL AND UNLESS FRANCHISEE SHALL HAVE BEEN FURNISHED BY COMPANY WITH ALL DISCLOSURE DOCUMENTS, IN WRITTEN FORM, AS MAY BE REQUIRED UNDER OR PURSUANT TO APPLICABLE LAW, FOR REQUISITE TIME PERIODS.

21.7    *Notices.*  Any and all notices required or permitted under this Agreement shall be in writing and shall be personally delivered, sent by registered mail, or by other means  to the addresses listed on the signature page of this Agreement (or to such other address as such party may designate by ten (10) days' advance written notice to the other party), which affords the sender evidence of delivery, or of rejected delivery, to the respective parties at the addresses shown on the signature page of this Agreement, unless and until a different address has been designated by written notice to the other party.  Any notice by a means which affords the sender evidence of delivery, or rejected delivery, shall be deemed to have been given at the date and time of receipt or rejected delivery.

## 22    SEVERABILITY AND CONSTRUCTION

22.1    *Severable Parts.*  Each Section, part, term and/or provision of this Agreement shall be considered severable, and if, for any reason, any paragraph, part, term and/or provision in this Agreement is determined to be invalid and contrary to, or in conflict with, any existing or future law or regulation, such shall not impair the operation of or affect the remaining portions, sections, parts, terms and/or provisions of this Agreement, and the latter will continue to be given full force and effect and bind the parties hereto; and said invalid sections, parts, terms and/or provisions shall be deemed not part of this Agreement; provided, however, that if Franchisor determines that said finding of illegality adversely affects the basic consideration of this Agreement, Franchisor may, at its option, terminate this Agreement.

22.2    *No Rights on Any Party other than Franchisor and Franchisee.*  Anything to the contrary in this Agreement notwithstanding, nothing in this Agreement is intended, nor shall be deemed, to confer upon any person or legal entity other than Franchisor or Franchisee and such of their respective successors and assigns as may be contemplated by this Agreement, any rights or remedies under or by reason of this Agreement.

22.3    *Scope of Promises.*  Franchisee expressly agrees to be bound by any promise or covenant imposing the maximum duty permitted by law which is contained within the terms of any provision

hereof, as though it were separately stated in and made a part of this Agreement, that may result from striking from any of the provisions hereof any portion or portions which a court may hold to be unreasonable and unenforceable in a final decision to which Franchisor is a party, or from reducing the scope of any promise or covenant to the extent required to comply with such a court order.

22.4    *Captions Only for Convenience.*   All captions in this Agreement are meant only for the convenience of the parties, and no caption shall be deemed in any manner whatsoever to affect the meaning or construction of any provision of this Agreement.   The singular usage includes the plural, where appropriate in the context, and the masculine and neuter usages include the other and the feminine.

22.5    *Costs.*   Unless otherwise agreed in writing, each party shall bear all of its own costs with respect to meeting its obligations under the terms of this Agreement.

22.6    *Recitals.*   The recitals set forth in this Agreement are specifically incorporated into the terms of this Agreement and hereby constitute a part thereof.

22.7    *Entire Agreement.*   This Agreement, any exhibit attached hereto, and the documents referred to in this Agreement, shall be construed together and constitute the entire, full and complete agreement between Franchisor and Franchisee concerning the subject matter hereof, and supersede all prior agreements.   No other representation has induced Franchisee to execute this Agreement, and there are no representations, inducements, promises, or agreements, oral or otherwise, between the parties not embodied in this Agreement that are of any force or effect with reference to this Agreement or otherwise.   The parties acknowledge and agree that they are relying only on the terms of this Agreement and any exhibits to this Agreement in reaching the decision of whether to enter into this Agreement.   (However, nothing in this Section is intended as, nor shall it be interpreted to be, a disclaimer by Franchisor of any, representation made in its Franchise Disclosure Document ("**FDD**"), including the exhibits and any amendments to the FDD.)

22.8    *Amendments.*   Except for those permitted to be made unilaterally by Franchisor hereunder, no amendment, change, or variance from this Agreement shall be binding on either party unless mutually agreed to by the parties and executed by their authorized officers or agents in writing.

22.9    *Gender.*   All terms used in any one number or gender shall extend to mean and include any other number and gender as the facts, context, or sense of this Agreement or any article or paragraph hereof may require.

## 23    **FORCE MAJEURE**

23.1    *Instances of Force Majeure.*   Neither party shall be responsible to the other for nonperformance or delay in performance occasioned by causes beyond its control, including without limiting the generality of the foregoing: (a) acts of God; (b) acts of war, terrorism, or insurrection; (c) strikes, lockouts, boycotts (other than by Franchisee's action or inaction); (d) fires and other casualties; and/or (e) the inability of Franchisor or its affiliates to purchase, deliver, and/or manufacture any products for which it is the sole source under this Agreement.

23.2    *Inability to Remit Funds.*   The inability of either party to obtain and/or remit funds shall be considered within control of such party for the purpose of Section 25.1 above.   If any such delay occurs, any applicable time period shall be automatically extended for a period equal to the time lost; provided, however, that the party affected makes reasonable efforts to correct the reason for such delay and gives to the other party prompt notice of any such delay; and further provided, however, that Franchisee shall remain obligated to promptly pay all fees owing and due to Franchisor hereunder, without any such delay or extension.

23.3   *No Extension of the Agreement.*   Nothing in this Section 23 shall be construed to result in an extension of the term of this Agreement.

## 24   ACKNOWLEDGMENT

24.1   *Franchisee's Investigation of the Business Possibilities.*   Franchisee acknowledges that it has conducted an independent investigation of the business franchised hereunder, recognizes that the business venture contemplated by this Agreement involves business risks, and that its success will be largely dependent upon the ability of Franchisee and if a corporation or a partnership, its owners as independent businesspersons.   Franchisor expressly disclaims the making of, and Franchisee acknowledges that it has not received, any warranty or guarantee, express or implied, as to the potential volume, profits, or success of the business venture contemplated by this Agreement.

24.2   *Receipt of FDD and Complete Agreement.*   Franchisee acknowledges that it received a copy of this Agreement, the exhibit(s) hereto, and agreements relating hereto, if any, with all of the blank lines therein filled in, at least five (5) business days prior to the date on which this Agreement was executed.   Franchisee further acknowledges that it received the Franchise Disclosure Document (the "**FDD**") required by the Federal Trade Commission Franchise Rule at least fourteen (14) days before the date on which this Agreement was signed.

24.3   *Franchisee Read the Agreement and Consulted.*   Franchisee acknowledges that it has read and understood the FDD, this Agreement, and the exhibits to this Agreement, and that Franchisor has accorded Franchisee ample time and opportunity to consult with advisors of Franchisee's own choosing about the potential benefits and risks of entering into this Agreement.   Franchisee acknowledges that it has no knowledge of any representations by Franchisor, or anyone purporting to act on Franchisor's behalf, that are contrary to the statements made in the FDD or contrary to the terms of this Agreement.

24.4   *No Conflicting Obligations.*   Each party represents and warrants to the others that there are no other agreements, court orders, or any other legal obligations that would preclude or in any manner restrict such party from:   (a) negotiating and entering into this Agreement; (b) exercising its rights under this Agreement; and/or (c) fulfilling its responsibilities under this Agreement.

24.5   *Franchisee's Responsibility for Operation of Landscape Lighting Business.*   Although Franchisor retains the right to establish and periodically modify LLL System standards, which Franchisee has agreed to maintain in the operation of Landscape Lighting Businesses, Franchisee retains the right and sole responsibility for the day-to-day management and operation of the Landscape Lighting Business and the implementation and maintenance of system standards at the Landscape Lighting Business.

24.6   *Different Franchise Offerings to Others.*   Franchisee acknowledges and agrees that Franchisor may modify the offer of its franchises to other franchisees in any manner and at any time, which offers and agreements have or may have terms, conditions, and obligations that may differ from the terms, conditions, and obligations in this Agreement.

24.7   *Success Depends on Franchisee.*   Franchisee acknowledges that the success of the business venture contemplated under this Agreement is speculative and depends, to a large extent, upon Franchisee's ability as an independent businessperson, his/her active participation in the daily affairs of the business, market conditions, area competition, availability of product, quality of services provided as well as other factors.   Franchisor does not make any representation or warranty express or implied as to the potential success of the business venture contemplated hereby.

A MARILLO - 2010 FDD (75)

5/2/12

24.8   *No Guarantees.*  Franchisor expressly disclaims the making of, and Franchisee acknowledges that it has not received nor relied upon, any warranty or guaranty, express or implied, as to the revenues, profits or success of the business venture contemplated by this Agreement.

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement (including but not limited to the provisions of Section 17 above) to be executed as of the first date set forth above.

**Lighthouse Landscape Lighting Franchisor, Inc.**

By: _____

Printed Name: Paul Anderson

Title: President

Franchisee _____

By: _____

Printed Name: ALEX B. JONES

Title: _____

Address for Notices to Franchisor:

Lighthouse Landscape Lighting Franchisor, Inc.
2112 Crown Drive
St. Augustine, Florida 32092
Attn: Paul M. Anderson

Address for Notices to Franchisee:

3925 Kileen Dr.

Amarillo, TX 79109

Attn: _____

**EXHIBIT A**

**PROTECTED TERRITORY**

| 1.2 | The Protected Territory under this Agreement shall be: AMARILLO / LUBBOCK / MIDLAND "WEST TEXAS" |
|---|---|
| Franchiser | Initials Franchisee |

**EXHIBIT B**

**SAMPLE FORM OF**
**NON-COMPETITION AND NON-DISCLOSURE AGREEMENT**
**(TO BE SIGNED BETWEEN FRANCHISEE AND ITS EMPLOYEES)**

This NON-COMPETITION AND NON-DISCLOSURE AGREEMENT (this "**Agreement**") is entered into this ___ day of _April_, 201_2_, between the ___LLLF___ ("**Franchisee**") and ___Alex B. Jones___ ("**Employee**").

WHEREAS, Franchisee and Lighthouse Landscape Lighting Franchisor, Inc. ("**Franchisor**") are parties to an Franchise Agreement dated _____, 201___ (the "**Franchise Agreement**") pursuant to which Franchisor has been granted the right to build and operate a "Lighthouse Landscape Lighting" business (the "**Landscape Lighting Business**").

WHEREAS, in connection with the operation of the Landscape Lighting Business, Franchisee has been granted a license to certain proprietary and other property rights and interests in and to the "Lighthouse Landscape Lighting" name and such other trademarks, trade names, service marks, logotypes, insignias, trade dress, designs, installation techniques and methods, sales methods, advertising techniques, and other information ("**Lighthouse Landscape Lighting System Information**") developed by Franchisor.

WHEREAS, pursuant to the Franchise Agreement, Franchisee is contractually obligated to Franchisor to protect the confidentiality of the Lighthouse Landscape Lighting System Information and enter into this Agreement with employees of the Franchisor.

In consideration of the employment of Employee by Franchisor, the parties agree as follows:

1.      Employee agrees that during the period of his employment he shall devote his full time, energy, and skill to the performance of the duties as assigned to him by the Franchisee, and that he shall faithfully and diligently serve and endeavor to further the Franchisee's best interests.

2.      Employee acknowledges that during his employment by the Franchisee he will have access to and acquire Confidential and Proprietary Information regarding the Franchisee's business, including Lighthouse Landscape Lighting System Information, which is not available to the general public ("**Confidential and Proprietary Information**").

3.      Employee understands and agrees that the Confidential and Proprietary Information is the exclusive property of the Franchisor, and it may not be directly or indirectly disclosed to third parties, misappropriated, or used for any purpose except Franchisor business. It is essential to the protection of the Franchisor's good will and to the maintenance of the Franchisor's competitive position that any Confidential and Proprietary Information be kept secret. Employee agrees that during and after his employment with the Franchisee he will not disclose any Confidential and Proprietary Information to others or use such information to employee's own advantage or the advantage of others.

4.      Any products, materials, methods, processes or services (collectively referred to as "methods"), developed by, or disclosed to Employee while employed by the Franchisee are the exclusive property of the Franchisor, regardless of whether they were made, developed or invented during ordinary business hours. Employee will not disclose any such method to persons not employed by the Franchisee without the prior written consent of the Franchisor.

5.      The success of the Franchisee's business depends upon its ability to develop, maintain and foster personal relationships between and among it employees, customers and prospective customers. These personal relationships are important to the Franchisor and its ability to compete

effectively.  In consideration of his employment by the Franchisor, Employee agrees that during his employment and for a period of three years following the voluntary or involuntary termination of his employment for any reason (these periods are referred to collectively as the "**Restricted Period**"), he will not, without the Franchisee's written permission:

a.      directly or indirectly be employed by, participate in, or be connected in any manner with the ownership, management, or control of any entity or activity which is directly or indirectly engaged in the Franchisor's business, which for purposes of this Agreement is defined as the establishment, development, operation and maintenance of business operations which provide the sale and service of landscape lighting products, installation and services as the company may authorize from time to time;

b.      except on behalf of the Franchisor, solicit, or participate in any activity  which solicits business from any person, firm, corporation or other entity which was a customer, supplier or partner of the Franchisor or any of its subsidiaries or related companies during the period of the Employee's employment, or from any successor in interest to any such person, firm, corporation or other entity for the purpose of securing business or contracts related to the Landscape Lighting Business; and

c.      (i) hire or offer employment to any individual who is or was at any time during the Restricted Period an employee of the Franchisor or one of the Franchisor's subsidiaries or an Independent Contractor (as hereinafter defined), (ii) solicit any individual who is or was at any time during the Restricted Period an employee of the Franchisor or the Franchisor's subsidiaries or (iii) encourage any such individual to terminate his or her relationship with the Franchisor or Franchisor's subsidiaries. For purposes of this Section, "**Independent Contractor**" shall include any individual who is or was an independent contractor whose principal job or function is or was to provide services to the Franchisor or one of its subsidiaries or related companies.

The three year period following the termination of the Employee's employment shall not include any period of time during which Employee is in violation of this Agreement or any period of time required to enforce this Agreement

6.      The parties agree that the breach or prospective breach of this Agreement will cause irreparable harm to the Franchisor for which monetary damages may not be adequate.  The parties therefore agree that in addition to any other remedies available to the Franchisor, which shall include the recovery of all damages incurred, as well as reasonable attorneys' fees and other costs, the Franchisor shall be entitled to injunctive or other equitable relief if Employee should breach or threaten to breach this Agreement.

7.      The Franchisor's rights specified in this Agreement are in addition to and not in lieu of any rights available under applicable law and regulations, including those governing trade secrets and other proprietary information.

8.      The parties intend that the covenants and agreements contained herein shall have the widest possible application.  If any covenant or agreement herein contained is found by a court to be unreasonable in duration, scope or character, the covenant or agreement shall not be rendered unenforceable thereby, but rather the duration, scope or character of such covenant or agreement shall be deemed reduced or modified with retroactive effect to render such covenant or agreement reasonable and, as so modified, such covenant or agreement shall be in force.

9.      Each party agrees that any judicial proceeding arising out of or relating to this Agreement (including any declaratory judgments) shall be filed exclusively in the United States District Court for the Middle District of Florida or (if there is no jurisdiction in the United States District Court) any state court with jurisdiction over Franchisor's headquarters location within the State of Florida.  Each party also hereby consents to, and will submit to, the personal and subject matter jurisdiction of any State or Federal court within the State of Florida in any proceeding to enforce any of its obligations under this Agreement.

10.     It is further understood and agreed that no failure or delay by a party hereto in exercising any right, power, or privilege thereunder shall operate as a waiver thereof nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any right, power or privilege hereunder.

11.     This Agreement does not create a guaranty of employment for any period of time. Employee agrees that his employment by the Franchisor may be terminated at any time at the will of either party.  Employee agrees that upon termination of his employment with the Franchisor, he shall promptly return all of the Franchisor's property, including Confidential and Proprietary Information, which is in his possession, and that he will not make or retain any copies of documents or other materials containing or constituting the Franchisor's Confidential and Proprietary Information.

12.     This Agreement is not intended and does not in any way amend, modify, supplement or supersede the terms and conditions of the Franchise Agreement.

13.     Employee understands and agrees that Franchisor is a third party beneficiary to this agreement as explained in the recitals, which are incorporated by reference herein.    Employee understands and agrees that Franchisor has the right to enforce the provisions of this Agreement.

14.     This Agreement shall be deemed to be made in and it shall be governed by and enforceable in accordance with the laws of the State of Florida, notwithstanding conflict of laws rules.

15.     This Agreement shall inure to the benefit of the parties' legal successors in interest.

16.     This Agreement constitutes the entire agreement between the parties with respect to the subject matter hereof, and shall supersede all previous communications, representations, understandings, and agreements, either oral or written between the parties or any officials or representatives thereof.  This Agreement may not be changed or modified except by a writing signed by the parties hereto, and only the President of the Franchisor shall have authority to bind the Franchisor.

**IN WITNESS WHEREOF**, the parties here to have duly executed this Agreement on the day and year first above written.

| Franchisee | Employee |
|---|---|
| By: | By: |
| Printed Name: ___R. Anderson___ | Printed Name: ___Alex B. Jones___ |
| Title: ___President___ | Title: _____ |

## EXHIBIT C

## GUARANTEE, INDEMNIFICATION, AND ACKNOWLEDGMENT

As an inducement to Lighthouse Landscape Lighting Franchisor, Inc. ("**Franchisor**") to execute the Lighthouse Landscape Lighting Franchise Agreement between Franchisor and _Alex B Jones + Kattie Jones_ ("**Franchisee**") dated _May 2_, 201_2_ (the "**Agreement**"), the undersigned, jointly and severally, hereby unconditionally guarantee to Franchisor and Franchisor's successors and assigns that all of Franchisee's monetary obligations under the Agreement will be punctually paid and performed.

Upon demand by Franchisor, the undersigned will immediately make each payment required of Franchisee under the Agreement (including but not limited to payments Franchisee is required to make to Franchisor and its affiliates). The undersigned hereby waive any right to require Franchisor to: (a) proceed against Franchisee for any payment required under the Agreement; (b) proceed against or exhaust any security from Franchisee; or (c) pursue or exhaust any remedy, including any legal or equitable relief, against Franchisee. Without affecting the obligations of the undersigned under this Guarantee, Franchisor may, without notice to the undersigned, extend, modify, or release any indebtedness or obligation of Franchisee, or settle, adjust, or compromise any claims against Franchisee. The undersigned waive notice of amendment of the Agreement and notice of demand for payment by Franchisee, and agree to be bound by any and all such amendments and changes to the Agreement.

The undersigned hereby agree to defend, indemnify and hold Franchisor harmless against any and all losses, damages, liabilities, costs, and expenses (including, but not limited to, reasonable attorney's fees, reasonable costs of investigation, court costs, and fees and expenses) resulting from, consisting of, or arising out of or in connection with any failure by Franchisee to perform any obligation of Franchisee under the Agreement, any amendment thereto, or any other agreement executed by Franchisee referred to therein.

The undersigned hereby acknowledge and agree to be individually bound by all of the covenants contained in Sections 8.1.2, 10, 13, 15, and 16 of the Agreement. The undersigned acknowledge and agree that this Guarantee does not grant the undersigned any right to use the "Lighthouse Landscape Lighting" marks or system licensed to Franchisee under the Agreement.

This Guarantee shall terminate upon the termination or expiration of the Agreement, except that all obligations and liabilities of the undersigned which arose from events which occurred on or before the effective date of such termination shall remain in full force and effect until satisfied or discharged by the undersigned, and all covenants which by their terms continue in force after the expiration or termination of the Agreement shall remain in force according to their terms. Upon the death of an individual guarantor, the estate of such guarantor shall be bound by this Guarantee, but only for defaults and obligations hereunder existing at the time of death; and the obligations of the other guarantors will continue in full force and effect.

Unless specifically stated otherwise, the terms used in this Guarantee shall have the same meaning as in the Agreement, and shall be interpreted and construed in accordance with Section 22 of the Agreement (including but not limited to the waiver of punitive damages, waiver of jury trial, agreement to bring claims within one year, and agreement not to engage in class or common

actions). This Guarantee shall be interpreted and construed under the laws of the State of Florida. In the event of any conflict of law, the laws of the State of Florida shall prevail (without regard to, and without giving effect to, the application of Florida conflict of law rules).

IN WITNESS WHEREOF, each of the undersigned has signed this Guarantee as of the date of the Agreement.

GUARANTOR(S)

(Seal)

Signed: _____
(In his/her individual capacity)

Printed Name: ALEX B. JONES

Home Address: 3925 KILEEN DR.
AMARILLO, TX 79109

(Seal)

Signed: _____
(In his/her individual capacity)

Printed Name: Kattie Jones

Home Address: 3925 Kileen Dr.
Amarillo, TX 79109

(Seal)

Signed: _____
(In his/her individual capacity)

Printed Name: _____

Home Address: _____

STATE OF Texas , CITY/COUNTY OF Potter , to wit:

**I HEREBY CERTIFY** that on this 2nd day of May , 2012, before me, the subscriber, a notary public in and of the state and city/county aforesaid, personally appeared Alex Jones + , who executed the foregoing Guarantee, Indemnification, and Acknowledgment. Kattie Jones

Brenda K. Sadler

Notary Public Brenda K. Sadler

MY COMMISSION EXPIRES: 5/15/12

BRENDA K. SADLER
NOTARY PUBLIC,
STATE OF TEXAS
My Commission Expires 05-15-2012

**EXHIBIT D**

**List of Principals in Franchisee**

| Name of Principal | Home Address | Interest (%) |
|---|---|---|
| ALEX B. JONES | 3925 KILEEN DR | 50 |
| KATTIE JONES | 3925 KILEEN DR | 50 |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

_____
Franchisor

**Initials**

_____
Franchisee

## Lighthouse Landscape Lighting
## Franchise Fee Addendum

This addendum will serve to modify the Franchise Fee. The standard Lighthouse Landscape Lighting (LLL) Franchise Fee is $20,000 and is being reduced to $2,000.

_____
Lighthouse Landscape Lighting Inc.

___4/23/12_____
Date

_____
Franchisee

___4/23/12_____
Date

**EXHIBIT E**

**<u>Authorization Agreement For Prearranged Payments (Direct Debit)</u>**

_____ (Name of Person or Legal Entity)

_____(ID Number)

The undersigned depositor ("**Depositor**") ("**Franchisee**") hereby authorizes Lighthouse Landscape Lighting Franchisor, Inc. ("**Franchisor**") to initiate debit entries and/or credit correction entries to the undersigned's checking and/or savings account(s) indicated below and the depository designated below ("**Depository**") ("**Bank**") to debit or credit such account(s) pursuant to Franchisor's instructions.

_____          _____
Depository                                 Branch

_____          _____
City                                       State                    Zip Code

_____          _____
Bank Transit/ABA Number                    Account Number

This authorization  is to remain in full and force and effect until sixty days after Franchisor has received written notification from Franchisee of its termination.

_____
Depositor

By:_____

Name:_____

Title:_____

Date:_____

# EXHIBIT 2

## EXHIBIT C

## GUARANTEE, INDEMNIFICATION, AND ACKNOWLEDGMENT

As an inducement to Lighthouse Landscape Lighting Franchisor, Inc. ("**Franchisor**") to execute the Lighthouse Landscape Lighting Franchise Agreement between Franchisor and _Alex B Jones + Kattie Jones_ ("**Franchisee**") dated _May 2_, 201_2_ (the "**Agreement**"), the undersigned, jointly and severally, hereby unconditionally guarantee to Franchisor and Franchisor's successors and assigns that all of Franchisee's monetary obligations under the Agreement will be punctually paid and performed.

Upon demand by Franchisor, the undersigned will immediately make each payment required of Franchisee under the Agreement (including but not limited to payments Franchisee is required to make to Franchisor and its affiliates). The undersigned hereby waive any right to require Franchisor to: (a) proceed against Franchisee for any payment required under the Agreement; (b) proceed against or exhaust any security from Franchisee; or (c) pursue or exhaust any remedy, including any legal or equitable relief, against Franchisee. Without affecting the obligations of the undersigned under this Guarantee, Franchisor may, without notice to the undersigned, extend, modify, or release any indebtedness or obligation of Franchisee, or settle, adjust, or compromise any claims against Franchisee. The undersigned waive notice of amendment of the Agreement and notice of demand for payment by Franchisee, and agree to be bound by any and all such amendments and changes to the Agreement.

The undersigned hereby agree to defend, indemnify and hold Franchisor harmless against any and all losses, damages, liabilities, costs, and expenses (including, but not limited to, reasonable attorney's fees, reasonable costs of investigation, court costs, and fees and expenses) resulting from, consisting of, or arising out of or in connection with any failure by Franchisee to perform any obligation of Franchisee under the Agreement, any amendment thereto, or any other agreement executed by Franchisee referred to therein.

The undersigned hereby acknowledge and agree to be individually bound by all of the covenants contained in Sections 8.1.2, 10, 13, 15, and 16 of the Agreement. The undersigned acknowledge and agree that this Guarantee does not grant the undersigned any right to use the "Lighthouse Landscape Lighting" marks or system licensed to Franchisee under the Agreement.

This Guarantee shall terminate upon the termination or expiration of the Agreement, except that all obligations and liabilities of the undersigned which arose from events which occurred on or before the effective date of such termination shall remain in full force and effect until satisfied or discharged by the undersigned, and all covenants which by their terms continue in force after the expiration or termination of the Agreement shall remain in force according to their terms. Upon the death of an individual guarantor, the estate of such guarantor shall be bound by this Guarantee, but only for defaults and obligations hereunder existing at the time of death; and the obligations of the other guarantors will continue in full force and effect.

Unless specifically stated otherwise, the terms used in this Guarantee shall have the same meaning as in the Agreement, and shall be interpreted and construed in accordance with Section 22 of the Agreement (including but not limited to the waiver of punitive damages, waiver of jury trial, agreement to bring claims within one year, and agreement not to engage in class or common

actions). This Guarantee shall be interpreted and construed under the laws of the State of Florida. In the event of any conflict of law, the laws of the State of Florida shall prevail (without regard to, and without giving effect to, the application of Florida conflict of law rules).

IN WITNESS WHEREOF, each of the undersigned has signed this Guarantee as of the date of the Agreement.

GUARANTOR(S)

(Seal)

Signed: _____
(In his/her individual capacity)

Printed Name: ALEX B. JONES

Home Address: 3925 KILEEN DR. AMARILLO, TX 79109

(Seal)

Signed: _____
(In his/her individual capacity)

Printed Name: Kattie Jones

Home Address: 3925 Kileen Dr. Amarillo, TX 79109

(Seal)

Signed: _____
(In his/her individual capacity)

Printed Name: _____

Home Address: _____

STATE OF Texas , CITY/COUNTY OF Potter , to wit:

**I HEREBY CERTIFY** that on this 2nd day of May , 2012, before me, the subscriber, a notary public in and of the state and city/county aforesaid, personally appeared Alex Jones + , who executed the foregoing Guarantee, Indemnification, and Acknowledgment. Kattie Jones

_Brenda K. Sadler_

Notary Public Brenda K. Sadler

MY COMMISSION EXPIRES: 5/15/12

BRENDA K. SADLER
NOTARY PUBLIC,
STATE OF TEXAS
My Commission Expires 05-15-2012

# EXHIBIT 3

PLAVE**KOCH**

July 17, 2017

**VIA FEDEX AND EMAIL (alex@jonesoutdoorlighting.com)**

Mr. Alex B. Jones
Jones Outdoor Lighting
3440 Bell Street, Suite 320 #284
Amarillo, Texas  79109

Re:  **DEMAND TO CEASE AND DESIST AND FOR PAYMENT** Expired Lighthouse
Landscape Lighting Franchise Agreement dated April 23, 2012 ("**Franchise
Agreement**") between Alex B. Jones ("**Franchisee**" and "**you**") and Lighthouse
Franchise Systems, LLC

Dear Mr. Jones:

This law firm represents Lighthouse Franchise Systems, LLC ("**LFS**"). As you know, the five-
year term of the Franchise Agreement expired on April 23, 2017. Although you were afforded
the right to renew the Franchise Agreement for an additional five-year term, you declined to
do so. Recently, LFS has learned that after the expiration of the Franchise Agreement, you
have continued to operate an outdoor lighting business and continued to use the
LIGHTHOUSE LIGHTING name, marks, and copyrighted images in operating that business,
in breach of the Franchise Agreement and in violation of LFS's intellectual property rights.
LFS demands that you immediately cease operating your outdoor lighting business in
Amarillo; cease all further use of the LIGHTHOUSE LIGHTING name, marks, and copyrighted
images; and transfer to LFS all telephone numbers, domain names, and social media and
online accounts you created while a LIGHTHOUSE LIGHTING franchisee.

As you know, you entered into the Franchise Agreement in April 2012 with LFS' predecessor,
Lighthouse Landscape Lighting Franchisor, Inc. ("LLLF"). In 2013, LFS became the franchisor
of the "Lighthouse Landscape Lighting" system by purchasing LLLF's assets. In connection
with the Franchise Agreement, you and your wife Kattie also signed a Guarantee,
Indemnification and Acknowledgement Agreement, under which you agreed to be personally
responsible for and bound by your obligations and covenants under the Franchise Agreement
(the "**Guarantee**"). Pursuant to the Franchise Agreement, you were licensed to operate a
"Lighthouse Landscape Lighting" business (the "**Landscape Lighting Business**") in West

**Plave Koch PLC**
12005 Sunrise Valley Drive, Suite 200
Reston, Virginia  20191
United States of America

www.PlaveKoch.com

**Regina B. Amolsch**
RAmolsch@PlaveKoch.com
*phone* 703.774.1211
*fax* 703.774.1201



Texas, particularly in the areas surrounding Amarillo, Lubbock, and Midland, Texas (the "**Protected Territory**") for five years.  The Franchise Agreement also afforded you the right to operate that business for an additional five years after the end of the initial term, subject to meeting certain requirements.

Rather than renew the Franchise Agreement at the end of its five-year term, you chose to allow the Franchise Agreement to expire.  You expressly agreed to take certain actions upon expiration of the Franchise Agreement, including the following:

(1) Immediately cease operating your Landscape Lighting Business and not hold yourself out to the public as a LIGHTHOUSE LIGHTING franchisee (Section 15.1);

(2) Immediately and permanently stop using, in any manner, the "Lighthouse" Proprietary Marks and all confidential and proprietary methods, procedures and techniques associated with the "Lighthouse" system, including any and all pictures of landscaping projects that were completed while you were a LIGHTHOUSE LIGHTING franchisee (Sections 15.2 and 15.4);

(3) Pay to LFS all amounts owing to LFS (or its affiliates), including damages and costs that LFS incurs as a result of your defaults (Sections 15.5 and 15.6.), including fees that you never paid on projects you completed while you were a franchisee that you never reported to LFS in an amount to be determined after an audit of your sales records;

(4) Return to LFS all materials, including the Manuals and other instruction materials, records, and customer lists, relating to the Landscape Lighting Business (Section 15.7) (excluding only a copy of your Franchise Agreement and your correspondence with LFS and its predecessor); and

(5) Transfer to LFS all telephone numbers, email addresses, domain names, social media accounts, and other online accounts (including Angie's List and Houzz accounts) that you used or created while you were a LIGHTHOUSE LIGHTING franchisee (Section 15.9).

In addition, you expressly agreed that for a period of two years after expiration of the Franchise Agreement, you would not own or operate a business offering outdoor lighting services or products within ten (10) miles of the Protected Territory.

Upon expiration of the Franchise Agreement, you failed to comply with the foregoing obligations.  You have not ceased operating your Landscape Lighting Business, but instead are now operating that business as "Jones Outdoor Lighting," serving Amarillo, west and central Texas, southern Oklahoma and Kansas, and eastern New Mexico.  Moreover, after expiration of the Franchise Agreement, you continued to solicit business using the LIGHTHOUSE LIGHTING name and marks, including using your lighthouse-lights.com email address, holding yourself out as the "West Texas Operations Manager" of "Lighthouse Outdoor Lighting" in the signature block of your emails, and providing estimates to potential customers on forms bearing the LIGHTHOUSE OUTDOOR LIGHTING mark and logo.  In



Mr. Alex B. Jones
July 17, 2017
Page 3

addition, you continue to utilize Houzz and Facebook (and likely other) online accounts that were formerly associated with your franchised Landscape Lighting Business and display pictures of projects you completed while you were operating your franchised business. Indeed, your Facebook page indicates that Jones Outdoor Lighting started operating in April 2012; in fact, you were operating as a LIGHTHOUSE LIGHTING franchisee from April 2012 to April 2017. Similarly, your Houzz page contains pictures and reviews of work you performed while a LIGHTHOUSE LIGHTING franchisee, including reviews that specifically mention "Lighthouse" and "Lighthouse Outdoor Lighting." In other words, in addition to breaching your covenant not to compete and other contractual obligations, your new business is trading off of the goodwill generated from your operation as a LIGHTHOUSE LIGHTING franchisee. LFS also has reason to believe that sales that you made while you were operating your franchised Landscape Lighting Business were never reported to LFS and that you never paid royalty fees for those sales.

LFS demands that you immediately cease operating your Landscape Lighting Business and comply with your non-competition covenants as provided in Section 16 of the Franchise Agreement and the Guarantee. LFS also demands that you cease all further use of the LIGHTHOUSE LIGHTING name and marks and pictures of projects you completed while a LIGHTHOUSE LIGHTING franchisee, and that you transfer the telephone number, Houzz account, and Facebook account (and any other online accounts) for your Landscape Lighting Business to LFS. In addition, LFS demands that you pay LFS all unpaid royalty fees; to that end, LFS demands that you provide records relating to your operations since 2012, including information relating to all sales and revenues generated by your Landscape Lighting Business, so that LFS can perform an accounting to determine the additional amounts that you owe.

Please contact me immediately to discuss your compliance with LFS's demands. If you fail to provide evidence of your compliance with the noncompete, your post-expiration obligations, and LFS's demands (or have otherwise failed to respond to this letter) within ten (10) days, LFS will take such actions as it deems appropriate to protect its rights, which may include seeking an order enjoining you from breaching your post-termination covenant not to compete and from continuing to infringe and unfairly compete with LFS and its marks in violation of federal law. If LFS is forced to take such action, LFS will seek to recover from you all costs and expenses (including attorneys' fees) LFS incurs as a result of such action, as permitted under the Franchise Agreement.

LFS reserves all of its rights in this matter, including among other things its right to assert claims with respect to other breaches or improper conduct that it may discover.

Sincerely,

Regina Amolsch

Regina B. Amolsch

cc:    Benjamin B. Reed, Esq.

**Regina Amolsch**

| | |
|---|---|
| **From:** | TrackingUpdates@fedex.com |
| **Sent:** | Tuesday, July 18, 2017 11:37 AM |
| **To:** | Regina Amolsch |
| **Subject:** | FedEx Shipment 779667035644 Delivered |
| | |
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Flagged |

# Your package has been delivered

## Tracking # 779667035644

Ship date:
**Mon, 7/17/2017**

Regina Amolsch
Plave Koch PLC
Reston, VA 20191
US



**Delivered**

Delivery date:
**Tue, 7/18/2017 10:34 am**

Alex Jones
Jones Outdoor Lighting
3440 Bell Street Suite 320
AMARILLO, TX 79109
US



## Shipment Facts

Our records indicate that the following package has been delivered.

| | |
|---|---|
| Tracking number: | 779667035644 |
| Status: | Delivered: 07/18/2017 10:34 AM Signed for By: C.GRIFFITH |
| Reference: | Lighthouse - Ind. F'ee |
| Signed for by: | C.GRIFFITH |
| Delivery location: | AMARILLO, TX |
| Delivered to: | Receptionist/Front Desk |
| Service type: | FedEx Standard Overnight |
| Packaging type: | FedEx Envelope |
| Number of pieces: | 1 |
| Weight: | 0.50 lb. |
| Special handling/Services: | Adult Signature Required |
| | Deliver Weekday |

| Standard transit: | 7/18/2017 by 3:00 pm |
|---|---|

✉  Please do not respond to this message. This email was sent from an unattended mailbox. This report was generated at approximately 10:36 AM CDT on 07/18/2017.

All weights are estimated.

To track the latest status of your shipment, click on the tracking number above.

Standard transit is the date and time the package is scheduled to be delivered by, based on the selected service, destination and ship date. Limitations and exceptions may apply. Please see the FedEx Service Guide for terms and conditions of service, including the FedEx Money-Back Guarantee, or contact your FedEx Customer Support representative.

© 2017 Federal Express Corporation. The content of this message is protected by copyright and trademark laws under U.S. and international law. Review our privacy policy. All rights reserved.

Thank you for your business.

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

LIGHTHOUSE FRANCHISE SYSTEMS, LLC

**DEFENDANTS**

ALEX B. JONES and KATTIE JONES

(b) County of Residence of First Listed Plaintiff    Chester
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE:    IN LAND CONDEMNATION CASES, USE THE LOCATION OF
THE TRACT OF LAND INVOLVED.

(c) Attorneys *(Firm Name, Address, and Telephone Number)*

Mitzi S. Mayfield, Esq., Riney & Mayfield LLP, 320 South Polk Street, Suite 600, Maxor Building, Amarillo, Texas 79101 (806) 468-3200

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

☐ 1  U.S. Government
      Plaintiff

☒ 3  Federal Question
      *(U.S. Government Not a Party)*

☐ 2  U.S. Government
      Defendant

☐ 4  Diversity
      *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)*                    *and One Box for Defendant)*

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment & Enforcement of Judgment<br>☐ 151 Medicare Act<br>☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans)<br>☐ 153 Recovery of Overpayment of Veteran's Benefits<br>☐ 160 Stockholders' Suits<br>☐ 190 Other Contract<br>☒ 195 Contract Product Liability<br>☒ 196 Franchise | **PERSONAL INJURY**<br>☐ 310 Airplane<br>☐ 315 Airplane Product Liability<br>☐ 320 Assault, Libel & Slander<br>☐ 330 Federal Employers' Liability<br>☐ 340 Marine<br>☐ 345 Marine Product Liability<br>☐ 350 Motor Vehicle<br>☐ 355 Motor Vehicle Product Liability<br>☐ 360 Other Personal Injury<br>☐ 362 Personal Injury - Medical Malpractice | **PERSONAL INJURY**<br>☐ 365 Personal Injury - Product Liability<br>☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability<br>☐ 368 Asbestos Personal Injury Product Liability<br>**PERSONAL PROPERTY**<br>☐ 370 Other Fraud<br>☐ 371 Truth in Lending<br>☐ 380 Other Personal Property Damage<br>☐ 385 Property Damage Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881<br>☐ 690 Other | ☐ 422 Appeal 28 USC 158<br>☐ 423 Withdrawal 28 USC 157<br>**PROPERTY RIGHTS**<br>☐ 820 Copyrights<br>☐ 830 Patent<br>☐ 835 Patent - Abbreviated New Drug Application<br>☐ 840 Trademark<br>**SOCIAL SECURITY**<br>☐ 861 HIA (1395ff)<br>☐ 862 Black Lung (923)<br>☐ 863 DIWC/DIWW (405(g))<br>☐ 864 SSID Title XVI<br>☐ 865 RSI (405(g)) | ☐ 375 False Claims Act<br>☐ 376 Qui Tam (31 USC 3729(a))<br>☐ 400 State Reapportionment<br>☐ 410 Antitrust<br>☐ 430 Banks and Banking<br>☐ 450 Commerce<br>☐ 460 Deportation<br>☐ 470 Racketeer Influenced and Corrupt Organizations<br>☐ 480 Consumer Credit<br>☐ 490 Cable/Sat TV<br>☐ 850 Securities/Commodities/ Exchange<br>☐ 890 Other Statutory Actions<br>☐ 891 Agricultural Acts<br>☐ 893 Environmental Matters<br>☐ 895 Freedom of Information Act |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | **LABOR** | ☐ 896 Arbitration |
| ☐ 210 Land Condemnation<br>☐ 220 Foreclosure<br>☐ 230 Rent Lease & Ejectment<br>☐ 240 Torts to Land<br>☐ 245 Tort Product Liability<br>☐ 290 All Other Real Property | ☐ 440 Other Civil Rights<br>☐ 441 Voting<br>☐ 442 Employment<br>☐ 443 Housing/ Accommodations<br>☐ 445 Amer. w/Disabilities - Employment<br>☐ 446 Amer. w/Disabilities - Other<br>☐ 448 Education | **Habeas Corpus:**<br>☐ 463 Alien Detainee<br>☐ 510 Motions to Vacate Sentence<br>☐ 530 General<br>☐ 535 Death Penalty<br>**Other:**<br>☐ 540 Mandamus & Other<br>☐ 550 Civil Rights<br>☐ 555 Prison Condition<br>☐ 560 Civil Detainee - Conditions of Confinement | ☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Management Relations<br>☐ 740 Railway Labor Act<br>☐ 751 Family and Medical Leave Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Employee Retirement Income Security Act | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision<br>☐ 950 Constitutionality of State Statutes |
|  |  |  | **FEDERAL TAX SUITS** |  |
|  |  |  | ☐ 870 Taxes (U.S. Plaintiff or Defendant)<br>☐ 871 IRS—Third Party 26 USC 7609 |  |
|  |  | **IMMIGRATION** |  |  |
|  |  | ☐ 462 Naturalization Application<br>☐ 465 Other Immigration Actions |  |  |

## V. ORIGIN *(Place an "X" in One Box Only)*

☒ 1  Original
      Proceeding

☐ 2  Removed from
      State Court

☐ 3  Remanded from
      Appellate Court

☐ 4  Reinstated or
      Reopened

☐ 5  Transferred from
      Another District
      *(specify)*

☐ 6  Multidistrict
      Litigation -
      Transfer

☐ 8  Multidistrict
      Litigation -
      Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
15 U.S.C. §§ 1051, 1121 and 1116
Brief description of cause:
Trademark infringement and breach of post-expiration noncompete and other contractual obligations by former franchisee.

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A **CLASS ACTION**
UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:    ☐ Yes   ☒ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*

JUDGE _____    DOCKET NUMBER _____

DATE _____    SIGNATURE OF ATTORNEY OF RECORD _____

**FOR OFFICE USE ONLY**

RECEIPT # _____    AMOUNT _____    APPLYING IFP _____    JUDGE _____    MAG. JUDGE _____

**INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44**

Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court.  This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.  Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed.  The attorney filing a case should complete the form as follows:

I.(a)  **Plaintiffs-Defendants.**  Enter names (last, first, middle initial) of plaintiff and defendant.  If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations.  If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

(b)  **County of Residence.**  For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing.  In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing.  (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

(c)  **Attorneys.**  Enter the firm name, address, telephone number, and attorney of record.  If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

II.  **Jurisdiction.**  The basis of jurisdiction is set forth under Rule 8(a), F.R.Cv.P., which requires that jurisdictions be shown in pleadings.  Place an "X" in one of the boxes.  If there is more than one basis of jurisdiction, precedence is given in the order shown below.
United States plaintiff.  (1) Jurisdiction based on 28 U.S.C. 1345 and 1348.  Suits by agencies and officers of the United States are included here.
United States defendant.  (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.
Federal question.  (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States.  In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.
Diversity of citizenship.  (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states.  When Box 4 is checked, the citizenship of the different parties must be checked**.**  (See Section III below**; NOTE: federal question actions take precedence over diversity cases.**)

III.  **Residence (citizenship) of Principal Parties.**  This section of the JS 44 is to be completed if diversity of citizenship was indicated above.  Mark this section for each principal party.

IV.  **Nature of Suit.**  Place an "X" in the appropriate box.  If there are multiple nature of suit codes associated with the case, pick the nature of suit code that is most applicable.  Click here for: Nature of Suit Code Descriptions.

V.  **Origin.**  Place an "X" in one of the seven boxes.
Original Proceedings.  (1) Cases which originate in the United States district courts.
Removed from State Court.  (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441.  When the petition for removal is granted, check this box.
Remanded from Appellate Court.  (3) Check this box for cases remanded to the district court for further action.  Use the date of remand as the filing date.
Reinstated or Reopened.  (4) Check this box for cases reinstated or reopened in the district court.  Use the reopening date as the filing date.
Transferred from Another District.  (5) For cases transferred under Title 28 U.S.C. Section 1404(a).  Do not use this for within district transfers or multidistrict litigation transfers.
Multidistrict Litigation – Transfer.  (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407.
Multidistrict Litigation – Direct File.  (8) Check this box when a multidistrict case is filed in the same district as the Master MDL docket.
**PLEASE NOTE THAT THERE IS NOT AN ORIGIN CODE 7.**  Origin Code 7 was used for historical records and is no longer relevant due to changes in statue.

VI.  **Cause of Action.**  Report the civil statute directly related to the cause of action and give a brief description of the cause.  **Do not cite jurisdictional statutes unless diversity.**  Example: U.S. Civil Statute: 47 USC 553  Brief Description: Unauthorized reception of cable service

VII.  **Requested in Complaint.**  Class Action.  Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.
Demand.  In this space enter the actual dollar amount being demanded or indicate other demand, such as a preliminary injunction.
Jury Demand.  Check the appropriate box to indicate whether or not a jury is being demanded.

VIII.  **Related Cases.**  This section of the JS 44 is used to reference related pending cases, if any.  If a related case exists, whether pending or closed, insert the docket numbers and the corresponding judge names for such cases. A case is related to this filing if the case: 1) involves some or all of the same parties and is based on the same or similar claim; 2) involves the same property, transaction, or event; 3) involves substantially similar issues of law and fact; and/or 4) involves the same estate in a bankruptcy appeal.

**Date and Attorney Signature.**  Date and sign the civil cover sheet.